**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Teresa Mechell GRIFFIN,**
**Defendant–Appellant.**

No. 92–6375.

United States Court of Appeals,
Tenth Circuit.

Oct. 26, 1993.

John E. Green, U.S. Atty., Kim Taylor, Leslie M. Kaestner, Asst. U.S. Attys., Oklahoma City, OK, for plaintiff-appellee.

David P. Henry, Oklahoma City, OK, for defendant–appellant.

Before BRORBY, BARRETT, and KELLY, Circuit Judges.

BRORBY, Circuit Judge.

Ms. Griffin was convicted of eight drug related counts including a conspiracy to possess and distribute cocaine base (crack) and was sentenced inter alia to four concurrent sentences of life imprisonment. Ms. Griffin appeals asserting her motion to suppress should have been granted; improper closing argument; and numerous sentencing errors. We reverse and remand.

## I.

Ms. Griffin was the common law wife of Juan Carlos Angulo–Lopez.[1] Together they managed a cocaine distribution ring. They obtained cocaine in Houston and transported it to Oklahoma City where the cocaine was "cooked" or converted to crack. They then acted as wholesalers distributing the crack to retail sellers. The charges against Ms. Griffin all arose from this cocaine distribution activity.

Ms. Griffin's participation in the cocaine distribution business came to an end when she and her companion, Bedina Coleman,[2] were apprehended at the Oklahoma City airport terminal with approximately $38,500 in cash from cocaine sales. Ms. Griffin confessed and led agents to her car where a large amount of cocaine was found. Ms. Griffin filed a motion to suppress this evidence, which, following an evidentiary hearing, was denied by the district court. Ms. Griffin appeals this decision arguing principally that her confession was invalid as she was in custody and the police failed to advise her as required by *Miranda*.[3] Ms. Griffin also raises the propriety of statements made by the prosecution in closing argument and of her sentence.[4]

Evidence before the district court at the suppression hearing was sharply conflicting. However, as the trial court found Ms. Griffin's testimony incredible, we look to the evidence supporting the Government's case and give to this evidence the benefit of every reasonable inference.

Two members of the Oklahoma City Police Department testified. The first, who was a member of the patrol division at the airport, testified he had been told by airline officials two weeks prior that two females were making frequent trips to Houston. They always showed up just a few minutes before departure, bought one-way tickets, and paid for them in cash. This raised the officer's suspicions as such conduct fit the "drug profile." On the evening in question, he observed Ms. Griffin and her companion, Bedina Coleman, do exactly this. The two women also matched descriptions provided by the airline employees. Shortly thereafter, he received a call from gate security that they found and confiscated three .357 magnum bullets from Ms. Griffin's purse but allowed her and her companion to board the plane. The officer, concerned about a corresponding .357 pistol being in the baggage, checked at the ticket counter to learn if a gun had been declared. As it had not and as he had seen the two women arrive with baggage, he asked the gate supervisor to board the plane and ask the defendant and her companion to step to the door of the plane. The officer, while standing on the jetway, talked to the two women standing in the plane. He asked them if they were together and they replied "No." He asked to examine their tickets and Ms. Coleman had both in her purse. He asked if they had checked luggage and both replied "No." He then showed them their baggage claim receipts and the bullets, told them his concerns and requested their consent to search their luggage, which they readily gave. They also agreed to accompany him while he searched their luggage.

The three then went to the briefing room of the airport police office where the women again consented to a baggage search. Prior

---

1. *See United States v. Angulo–Lopez*, 7 F.2d 1506 (10th Cir.1993).

2. *See United States v. Coleman*, 7 F.2d 1500 (10th Cir.1993).

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Because we remand on the motion to suppress, we need not resolve these latter issues. In particular, many of Ms. Griffin's sentencing arguments hinge on evidence of her cooperation during the police questioning at issue.

to their arrival, the bags had been set aside and a drug sniffing dog had alerted to Ms. Griffin's bag. When the officer opened Ms. Griffin's bag, he found large bundles of currency totaling approximately $38,500. He asked the women three or four times who owned the currency and received no reply. He told the women they were free to go and were not under arrest, but he had to investigate the drug tainted money before he could release it. The officer testified he did not arrest or have probable cause to arrest as there was no law against possessing drug tainted money. A money count began and Ms. Griffin was told she was free to remain to verify the count. About that time, the second police officer arrived.

The second officer, who was a detective in the drug interdiction unit, testified he was called by the first officer. He arrived about thirty minutes later where he found three uniformed policemen and the two women in the same location as the baggage search—a "fairly large room" in the police area. Policemen were counting the money. The first officer told him Ms. Griffin was most likely to be involved. The second officer then asked Ms. Griffin if he could speak to her about the money and if she would accompany him to an office. She agreed. The second officer took her to his private office in the police area which was 8' or 10' by 10'. The officer sat behind his desk with his back to the door, which remained open, and Ms. Griffin sat next to his desk. The officer sat between her and the door. The officer testified he asked her who the money belonged to, and Ms. Griffin took a deep breath and hung her head. He then asked her if she was employed, and she said "No." As he knew she had purchased an airline ticket, he asked her how she was making a living. He then asked if the money was narcotic related and again Ms. Griffin took a deep breath and hung her head. He then asked why she was coming to Oklahoma City and traveling around, and she replied she lived in Houston and had friends in Oklahoma City. He asked her again who the money belonged to and was told it was a subject's in Houston. She was asked who and took a deep breath, put her head down, and did not answer. She was asked again if

the money was narcotic related and she said it was.

She was then asked how she had obtained the money and where it came from. She apparently gave a lengthy answer touching upon her drug related activities, including communication via a pager. He asked and received permission to examine her pager. He asked her why she had sold one kilogram of cocaine powder for $20,000 knowing that crack is more expensive than powder. He asked her where her car was and if she had narcotics in her car. She initially put her head down and did not answer but then stated her car still contained cocaine. He asked her how much cocaine she had in her car. She estimated nearly half a pound. His partner arrived and the officer left his partner in the room with Ms. Griffin when he left to talk to Ms. Coleman. His partner remained closer to the door. While gone, the officer took custody of the money and placed it in the evidence locker. Upon returning, he asked Ms. Griffin if he could go through her purse for weapons and anything else that might pertain to the case. He found $600 which he removed as she "had just delivered two kilograms of cocaine and had $38,000. I assumed it was processed also."

At the suppression hearing, the second officer denied Ms. Griffin was in police custody during this questioning. He then described taking her to another officer's unmarked vehicle. Ms. Griffin, the officer and two other officers drove to Ms. Griffin's car located at an off-airport parking lot. At her car, he obtained written consent to search the auto. Ms. Griffin told him the cocaine was in the glove box, and there he found it. At this point, he told her charges would be presented to the district attorney's office and advised her of her *Miranda* rights. Ms. Griffin then directed the officers to the apartment complex where she said she had distributed drugs earlier that day.

Based upon the officers' testimony, the court denied the motion to suppress from the bench with little explanation except to say defendant's evidence was not credible and that an explanatory written order would follow. The record does not reveal the explanatory order was ever filed.

Ms. Griffin contends she was in custody of the police at all times from her encounter with the first police officer. She therefore argues that as she was not advised as required by *Miranda,* all evidence flowing therefrom should be suppressed.

*Miranda* instructs us that the prosecution may not use statements stemming from questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of freedom of action in any significant way unless it first demonstrates the use of procedural safeguards effective to secure the Fifth Amendment's privilege against self incrimination. *Miranda* goes on to spell out these procedural requirements by specifying what rights the person in custody must clearly understand.

The ultimate question is when was Ms. Griffin placed in custody for the purpose of triggering *Miranda*'s requirements. Was it when the first officer caused Ms. Griffin to meet him at the aircraft door, as Ms. Griffin contends? Was it when the police actually found the physical evidence and notified Ms. Griffin charges would be filed, as the police contend?

## II.

■ The standard of review for a motion to suppress is well established. The trial court's findings of fact must be accepted by an appellate court unless they are clearly erroneous. *E.g., United States v. Swepston,* 987 F.2d 1510, 1513 (10th Cir.1993) (citing *United States v. Waupekenay,* 973 F.2d 1533, 1535 (10th Cir.1992)). We have before us no specific or detailed findings of fact, only the trial court's statement that the Government's evidence was credible and defendant's was not. We must therefore uphold the trial court's ruling insofar as it applies to the facts if there is any reasonable view of the evidence to support it. *United States v. Cooper,* 733 F.2d 1360, 1364 (10th Cir.), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). We therefore decide this case on the assumption the testimony of the police officers was true and we give to this testimony the benefit of every reasonable inference.

The trial court is entitled to no such assumptions concerning issues of law as we review those de novo. *Waupekenay,* 973 F.2d at 1535. Stated somewhat differently, there are no factual issues in this case, only legal issues.

We view the facts of this case as presenting two separate and discrete police/citizen encounters. The first involved a police officer's well founded suspicions that Ms. Griffin was carrying a weapon upon a commercial airliner thereby presenting a hazard to the safety of the plane, the crew, and the passengers. Ms. Griffin was subjected only to brief and pertinent questions and was informed she was free to go and not under arrest. The second encounter was significantly different. It involved a police officer who suspected Ms. Griffin's involvement in drug crimes and took place under different circumstances. The first situation is easily answered; the second is not.

■ There are three categories of police/citizen encounters. *See Cooper,* 733 F.2d at 1363. The first is characterized by the voluntary cooperation of a citizen in response to noncoercive questioning. The second is a *Terry*[5] stop. This is usually characterized as a brief, nonintrusive detention during a frisk for weapons or preliminary questioning. To justify a *Terry* stop, the police officer need have only specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. The third category is an arrest usually characterized by highly intrusive or lengthy search or detention. *Cooper,* 733 F.2d at 1363. Case law is well established that a defendant is not in custody under either of the first two encounters and therefore *Miranda* warnings need not usually be given. *Berkemer v. McCarty,* 468 U.S. 420, 437–40, 104 S.Ct. 3138, 3148–50, 82 L.Ed.2d 317 (1984); *United States v. Pena,* 920 F.2d 1509, 1515 (10th Cir.1990) (routine traffic stop is not custodial), *cert. denied,* —— U.S. ——, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991); *United States v. Chalan,* 812 F.2d 1302, 1306–07 (10th Cir.1987) (wholly voluntary questioning is not custodial). *Miranda* warnings were designed to protect a citizen

---

5. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

against the evils of a custodial interrogation and were not intended to unduly interfere with law enforcement's obligation to protect society. Thus, *Miranda* warnings are usually required in the third category of citizen/police encounter. *California v. Beheler*, 463 U.S. 1121, 1124, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1983) (per curiam); *United States v. DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir.1978) (*Miranda* required if functional equivalent to arrest).

## A.

▆▆▆ The encounter between the first police officer and Ms. Griffin fell into one of the first two categories. Law enforcement officers may briefly detain a traveler and her luggage to pursue a limited course of investigation provided the officers have a reasonable, articulable suspicion justifying the intrusion. *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *United States v. Hall*, 978 F.2d 616, 620 (10th Cir.1992). Important government interests include effective crime detection and prevention, and minimizing the risk of harm to officers and the public. *Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981); *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880; *see United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) ("The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit."). Reasonable suspicion, analyzed on the totality of the circumstances, requires a " 'minimal level of objective justification' " which the officers can articulate. *United States v. Bloom*, 975 F.2d 1447, 1456 (10th Cir.1992) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)).

▆▆▆ Against the Government interest, we weigh the nature and extent of the intrusion. Where the police limit their investigation to an on-the-spot inquiry, such as using a narcotics detection dog, strong government interests based on articulable facts will justify the limited investigation of personal property. *See Place*, 462 U.S. at 705–06, 103 S.Ct. at 2643–44. An officer's request for consent to search personal luggage does not taint an otherwise consensual encounter "as long as the police do not convey a message that compliance with their request is required." *Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Nor is an impermissible detention caused simply because an officer approaches an individual and asks a few questions. *Id.* During a *Terry* stop a police officer may "ask [a] detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicion." *Berkemer*, 468 U.S. at 439, 104 S.Ct. at 3150; *Cordoba v. Hanrahan*, 910 F.2d 691, 693 (10th Cir.), *cert. denied*, 498 U.S. 1014, 111 S.Ct. 585, 112 L.Ed.2d 590 (1990).

▆▆▆ The district court properly concluded *Miranda* warnings were not essential in Ms. Griffin's encounter with the first officer as she was not in custody. Looking at the Government's evidence in the most favorable light and giving this evidence the benefit of all reasonable inferences, as we must, we can only conclude as did the district court. Ms. Griffin was stopped after bullets were found on her person and after a drug sniffing dog alerted on her baggage. These facts reasonably support an officer's further investigation to protect public safety and to uncover criminal activity. Further, the extent of intrusion was warranted. Ms. Griffin was only briefly detained; Ms. Griffin was informed she was not under arrest and was free to leave; Ms. Coleman consented; and the encounter took place at times in a public area. The evidence flowing from this encounter was properly admitted in the absence of *Miranda* warnings.

## B.

▆▆▆ As no *Miranda* warnings were given during Ms. Griffin's encounter with the second police officer, we must decide if Mr. Griffin was in custody.[6] *Miranda* warnings

---

6. Neither party disputes the second police encounter involved interrogatory questions. Interrogation is defined as words and actions that the police should know are "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689,

are required when the defendant is in custody and subject to interrogation. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. In order to determine whether or not a person is in custody for *Miranda* purposes, a court must examine all relevant facts, the only relevant inquiry being how a reasonable person in the suspect's position would have understood his situation. *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 1351; *Chalan*, 812 F.2d at 1306. If, from an objective viewpoint,[7] someone in Ms. Griffin's position would reasonably believe her freedom of action had been curtailed to a "degree associated with a formal arrest," then she would be held in custody during the interrogation. *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520; *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150.

■ The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive. In the past, we have avoided hard line rules to govern this analysis, and our opinion today should not be interpreted as an exhaustive pronouncement. Several factors, however, have been useful in testing the atmosphere of custody. First, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting. *See Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam); *Chalan*, 812 F.2d at 1305 (no *Miranda* required when suspect came to the interview voluntarily with his mother, was free to leave at any time, and interviewing officers told him he did not have to answer any questions and he was not a suspect in the case); *United States v. Griffin*, 922 F.2d 1343, 1349–50 & n. 4 (8th Cir.1990) (citing cases from other circuits). Conversely, the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention. *See Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S.Ct. 486, 490, 112 L.Ed.2d 489 (1990) (*Miranda* required prior to compelled interview); *Griffin*, 922 F.2d at 1350 & n. 5 (citing cases).

A second factor indicative of a custodial setting is the nature of questioning. While *Terry* type investigations allow for limited questioning to confirm an officer's suspicions, *Cordoba*, 910 F.2d at 693 (quoting *Berkemer*, 468 U.S. at 439, 104 S.Ct. at 3149), prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave. Police and suspects should not have to guess as to when custody arises after a temporary stop. In *Berkemer*, the Court advised the practice of giving *Miranda* warnings at the earliest possible point a police/citizen encounter evolves past a *Terry* stop. *Berkemer*, 468 U.S. at 431–32 & n. 13, 104 S.Ct. at 3145–46 & n. 13. The principal advantage of *Miranda* is as a simple line of demarcation which may benefit a suspect but which ultimately benefits law enforcement in the reduction of unnecessary dispute over suppression of evidence. *Berkemer*, 468 U.S. at 430, 104 S.Ct. at 3145 (quoting *Fare v. Michael C.*, 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979)). Where the nature of the police/citizen encounter progresses beyond a short investigatory stop, a custodial environment is more likely.

A final factor commonly examined is the circumstances showing a "police dominated" atmosphere. *Berkemer*, 468 U.S. at 439, 104 S.Ct. at 3149; *Miranda*, 384 U.S. at 445, 86 S.Ct. at 1612. Where police are in full con-

---

64 L.Ed.2d 297 (1980); *United States v. Gay*, 774 F.2d 368, 379 (10th Cir.1985). The second officer's questioning of Ms. Griffin directly sought her admission of involvement in narcotics sale and possession. Ms. Griffin's responses were sufficiently incriminating to form the grounds for her conviction.

7. During the suppression hearing, the second officer testified that, until cocaine was discovered in a consensual search of Ms. Griffin's car, she was not in "custody." Subjective intent of an officer to arrest or place the suspect in formal custody is irrelevant, however. *See* Wayne R. LaFave & Jerold H. Israel, 1 *Criminal Procedure* § 6.6(c) (1984). *Miranda*'s procedural requirements are not so easily avoided by an officer's assertion that, despite the coercive nature of the investigatory detention, a suspect was not intended to be placed in custody. Neither will an officer's unarticulated plan to arrest an individual initiate "custody" if a reasonable person would not be aware of a custodial detention. *Pena*, 920 F.2d at 1516 (citing *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151).

trol of the questioning environment, custody is more easily found. Circumstances might include: separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled. *Compare Di-Giacomo*, 579 F.2d 1211 (*Miranda* required when suspect was separated from his friends in a parking lot by four officers and threatened with arrest if he did not answer their questions) *with Chalan*, 812 F.2d 1302 (noncustodial interview when suspect voluntarily arrived at a community center for questioning in the presence of his mother). *See Griffin*, 922 F.2d at 1351–52 (citing cases from other circuits).

 Based on the above factors, we find a reasonable person would have understood herself to be in custody if she were in the same encounter as Ms. Griffin and the second officer. *Miranda* was designed to avoid the potential evils that may arise during custodial interrogation. This case, in many respects, typifies the situation *Miranda* was meant to protect. In reaching this conclusion we reiterate that our analysis today is not intended to depart from the case-by-case approach necessary for a totality of the circumstances analysis.

Subsequent to an initial stop and questioning, Ms. Griffin was separated from her friend and asked to accompany an officer to a small private office within a police-controlled area of the airport. The second police officer knew defendant was a suspect in a drug crime. He took the suspect from an open conference area to a small police-restricted room, albeit voluntarily.[8] Ms. Griffin was not told that she could refuse to answer the officer's questions or terminate the interview at any time and leave the smaller room. He placed the defendant in a situation where there was no exit except around the police. The questions were case specific; they continued even after it was obvious defendant was incriminated, and only after a full and complete confession and after the defendant led the police to contraband did the police properly advise defendant. A reasonable person under the same circumstances would believe she had no choice but to continue to answer the incriminating questions.

To accept the Government's conclusion that defendant voluntarily submitted to continued interrogation, which resulted in more details of the crime, would effectively gut the custodial requirement of *Miranda*. The analysis of the custodial requirement focuses upon what a person in the same position as the suspect would reasonably believe, and not upon how a reasonable law enforcement officer would perceive the situation.

Under these circumstances, we are unable to agree with the district court's denial of Ms. Griffin's motion to suppress. Allowing as true the Government's evidence, Ms. Griffin was in custody during her questioning by the second officer. *Miranda* warnings were required prior to extensive questioning by the second officer, certainly after Ms. Griffin was moved to a smaller private office. Consequently, we **REVERSE** and **REMAND** with instructions to grant Ms. Griffin's motion to suppress evidence adduced by Officer Hughes during the second police encounter.

---

8. The United States essentially argues Ms. Griffin was not in custody because she voluntarily consented to accompany the second officer and respond to his questions. The Government does not argue Ms. Griffin expressly or implied waived her privilege against self-incrimination in light of proper warnings. Nor do we find this case akin to the wholly voluntary and noncoercive environment examined in *Chalan*. We merely respond that to allow a suspect to "consent" to a custodial setting would severely undercut the purpose of *Miranda* and we decline to do so.