**UNITED STATES COURT OF APPEALS**
**Filed 12/27/96**
**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

LAWRENCE ALAN BAIN,

    Defendant-Appellant.

No. 95-6419
(D.C. No. CR-95-79-A)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **HOLLOWAY**, and **HENRY**, Circuit Judges.

Defendant Lawrence Bain brings this timely direct appeal from his conviction on four counts arising from a bank robbery. The charges in the indictment were robbery of a federally insured financial institution (18 U.S.C. § 2113(a) and (d)); knowingly using and carrying a firearm during and in relation to commission of a crime of violence (18 U.S.C. § 924(c)(1)); possession of a firearm by a convicted felon (18 U.S.C. § 922(g)(1)); and knowing possession of an unregistered 12-gauge shotgun having a barrel length less than

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

18 inches (26 U.S.C. §§ 5841 and 5861(d)). Defendant was convicted on a jury verdict of guilty on all four counts. Defendant was sentenced to 117 months in prison.

**I**

Bank IV of Edmond was robbed on May 24, 1995, at about 2:05 p.m. by a man dressed in a button down shirt over a tee shirt, with his face concealed by a hat, glasses, and a mask. Witnesses could not even tell the race of the robber because he was so completely covered, but said that he "sounded" like a white man. The robber had a sawed-off shotgun and a sack into which he ordered two employees to put money. The robber took $11,515.00 and two dye packs. The descriptions given by bank employees had some discrepancies, and the videotape from the surveillance camera did not show the robber's face because of the mask. The robber fled the bank in a blue car. An employee saw pink smoke coming from the car as the robber drove away, indicating that at least one of the dye packs had exploded. The dye packs contained tear gas as well as dye. A customer at the drive-in window saw the robber leaving the bank and believed that the car he was driving was a 1983 or 1984 blue Oldsmobile. He saw the car go south on Bryant Street and turn right on 9th Street. Another driver passed a car with pink smoke coming out the window and saw it turn off Bryant onto 9th Street.

Officer Adrian Neal had just parked his car at the police station and started to enter the building when he heard on his radio that a robbery had occurred. As he drove toward the bank he heard a report that a light blue, four door car, possibly an Oldsmobile, had been seen

2

leaving the bank and turning onto 9th from Bryant. Going south down Boulevard Street, near where the getaway car had last been seen, Officer Neal saw a light blue four door car coming towards him, driven by a man in a white tee shirt with a baseball cap. Neal turned around and followed. He saw the car make another turn and continued following. He estimated that he lost sight of the car for no more than 20 seconds. When he next saw the car, it was parked at the library. From one-half block away, Neal saw a white man in a white tee shirt and a baseball cap near the car. The man resembled the man Neal had seen driving the car, and he was walking into the library. As the officer approached the library, the man entered the library through the front door.

Officer Neal parked behind the blue car. Looking into the car, he saw an object wedged in the crack between the split bench style front seat. Protruding up from the seat Neal saw what looked like the grip of a gun, and what appeared to be the end of a gun barrel was partly visible on the underside of the seat. Moments later Detective Mize arrived. Mize stayed with the car while Neal went into the library. Mize also could see what looked like a gun. He began taking pictures and opened the unlocked car door to facilitate his photography.

Officer Neal was joined inside the library by Officer Fees and others. Neal testified that a woman leaving the library told him she had just seen a man run into the bathroom. When no one was found in the bathroom, another officer pointed to a large man wearing a

hat and a white tee shirt. Neal said that was the man, and defendant was arrested. He was turned over to FBI agent Jeff Jenkins.

Jenkins told defendant he was under arrest for bank robbery and would be taken to the FBI office. He told defendant that he did not want to hear a word from him. Agent Jenkins did not advise defendant of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). In the agent's car on the way to the FBI office, defendant started to talk. He said that he did not rob a bank, that it is too hard to rob a bank in Edmond because there's no place to park. Defendant said he had been at the "bank -- library" at 1:45 checking out a book. He said that someone must have stolen his car, used it in a robbery and parked it in its original spot again. He said that he normally left his keys in his car. The FBI agents did not ask any questions or say anything to defendant after Agent Jenkins originally warned him not to say anything. Agent Jenkins took notes of defendant's statements in the car.

Defendant refused to consent to the search of his car. After his arrest, the car was impounded and inventoried. Among the things found were a shotgun loaded with a single shell, a wallet, sunglasses, a baseball cap, a sack containing $11,398.00 ($117 less than was reported taken in the robbery) and red dye, gloves, a mask, a shirt, a notebook that belonged to defendant which had notes about recent bank robberies in the area, and a stolen license plate with duct tape on it, on which defendant's fingerprint was found. No fingerprints were found on the gun, the shell, the sunglasses, the currency or the sack. Most of the hairs found

4

in the car were not suitable for comparison. A hair believed to be from a black person was found on the mask, and a hair consistent with defendant's was found on the shirt.

Other evidence was later found at the library. Less than an hour after defendant's arrest, a library patron found a set of car keys lying on the floor near where defendant had been arrested. The keys were found to be for defendant's car. The next day, another patron found four shotgun shells on a book shelf in the area near where the arrest had been made.

Defendant was well known at the library. He went there every day, sometimes several times in a day. He had told an acquaintance in the library that he was going to rob a bank. This conversation was about two months before the robbery at issue. Several library employees saw defendant on the day of his arrest, but none saw him during the time of the robbery. One employee said she saw him just before his arrest and he appeared to be in a hurry, although he typically was very slow moving. Another observed that his eyes were red just before his arrest (which could have been from the tear gas in the dye pack). No testing for traces of red dye was done on defendant's clothes, which had no dye visible on them.

More than two months after the robbery, Detective Mize and Officer Neal went to defendant's home and asked defendant's wife for permission to search. She said she did not want the officers to come into the house, but she consented to their search of the yard and garage. Within the garage was a small room which defendant had formerly used as an office for his business. Detective Mize opened a filing cabinet in the office and found thirteen shotgun shells. One of these shells was similar to the one which had been found in the

shotgun in defendant's car immediately after the robbery, in that it appeared not to have been a new shell but one which had been reloaded. One of the four shells which had been found in the library the day after defendant's arrest also had similar characteristics.

## II

Defendant alleges error in the district judge's refusal to grant two separate motions to suppress evidence. We first address defendant's contention that the search of his car violated his Fourth Amendment rights and that the evidence found there should therefore have been excluded. Review of the district court's findings of fact on a motion to suppress is under the clearly erroneous standard, but the ultimate question of the reasonableness of a search is a legal one subject to *de novo* review. E.g., United States v. Chatman, 994 F.2d 1510, 1514 (10th Cir. 1993).

The search of the car was without a warrant and without consent. The district judge found that probable cause to arrest defendant was established when the officers saw the butt of the gun in the car. Although the judge's oral findings and conclusions do not specifically so state, it is clear that he found that search of the car was also supported by probable cause. The judge stated: "I find that there was probable cause for the actions done at the library . . . ." II R. at 46. The search was also held to be a valid inventory search after the valid arrest. The court also supported the ruling by reliance on the mobile nature of the automobile, citing Carroll v. United States, 267 U.S. 132 (1925).

6

Defendant argues that the search began before his arrest and so was not an inventory search. This contention is based on the fact that Detective Mize had already opened the car door to get a better look at the gun before defendant was arrested. Officer Neal had not seen anyone get out of the car, defendant maintains, so his observations do not provide grounds for the search, and cannot cure the illegality of Detective Mize's actions. The subsequent inventory search, defendant urges, was tainted by Mize's illegal search. Defendant also contends that no exigency justified the search, because his arrest precluded him from using the car to escape and the car was safely located in the library parking lot where it posed no hazard.

We find defendant's arguments unconvincing. The undisputed evidence was that portions of the sawed-off shotgun were visible through the car window and were in fact observed by Officer Neal and Detective Mize without entering the vehicle. We agree with the district judge's conclusion that the combination of the description of the getaway car provided by witnesses at the bank, Officer Neal's observation of the car en route to the library, and observation of the gun in plain view within the parked automobile provided sufficient probable cause for any search of the car. Under the circumstances, no further justification was required for the very limited search effected by Detective Mize opening the car door. United States v. Crabb, 952 F.2d 1245 (10th Cir. 1991); see also United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993).

Equally important, we believe, is the fact that all of the items seized from the car, with the exception of the gun, were found in the subsequent inventory search, which we hold was proper. Defendant does not dispute that the car was inventoried pursuant to police policy. His only challenge to the inventory search is based on his contention that the inventory was a result of a prior unlawful search, that being Detective Mize's opening of the car door to facilitate his photography. As we have just explained, we do not agree that Detective Mize's actions were improper. Even if they had been, however, it is simply not correct that the inventory was the "fruit" of this entry. Detective Mize's actions resulted in no additional information being obtained by the authorities, just better pictures. We would see no reason to condemn the inventory of the car's contents on the basis of the detective's having previously opened the car door, even if we were to conclude that the detective acted improperly, because the defendant's arrest and the subsequent inventory search were clearly the result of all of the other information the authorities had obtained and not at all the result of Detective Mize having opened the car door.

### III

We next consider defendant's argument that the shotgun shells found in the search of his home, with his wife's consent, should have been suppressed. Defendant contends that the search of the filing cabinet in the office within his garage exceeded the scope of the permission given by defendant's wife. This is so, he contends, because Mrs. Bain did not have authority to consent to the search of either the office or the filing cabinet. Defendant's

8

argument thus tends to conflate two separate issues: whether Mrs. Bain had authority to consent to the search of the office and the filing cabinet and, if so, whether she did in fact consent to search of those areas. As we shall explain, another issue may arise from consideration of these, and that is what the officers would have reasonably understood to be the extent of Mrs. Bain's authority and of her consent.

As we have already noted, review of the district court's findings of fact on a motion to suppress is under the clearly erroneous standard, but the ultimate question of the reasonableness of a search is a legal one subject to *de novo* review. United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994) (applying these standards to the issue of the scope of consent to search). The government has the burden of showing that the consent was effective to make the search a reasonable one. United States v. Salinas-Cano, 959 F.2d 861, 864 (10th Cir. 1992).

The district court found that Mrs. Bain had equal access to the interior office in the garage and defendant had made no attempt to exclude her from it. Mrs. Bain testified at the suppression hearing that she considered the room defendant refers to as his office as merely part of the garage. The office and filing cabinet had been used by defendant when he had been operating a contracting business out of the home, but Mrs. Bain testified that for at least several months prior to defendant's arrest "things had been slow . . . . He hadn't done much work." III R. at 86. The desk which defendant had formerly used in the office had been moved into the house in October, months before his arrest. Mrs. Bain did not use the filing

cabinet. Although defendant had told the children to stay out of the office, they had been playing there since he had been in jail awaiting trial. Mrs. Bain seldom went into the office, although defendant had never told her not to do so, and she occasionally had entered it in the past because two refrigerators were kept there. At the time of the search, the refrigerators were not in use. In response to a question by the court, Mrs. Bain said that her husband had never told her to stay out of the office or out of the filing cabinet. III R. at 87.

We find it helpful to consider separately the reasonableness of the search of the garage office generally and the search of the filing cabinet. As to the garage office, the district judge's conclusion that the search did not exceed the scope of Mrs. Bain's consent was based on the facts summarized above, which fact findings we cannot hold to be clearly erroneous because they are supported by the evidence. Based on these facts, the judge's conclusion is correct. We also agree with the conclusion, which is implicit in the judge's oral ruling, that these facts establish that Mrs. Bain had the authority to consent to the search of the garage office.

We read the judge's ruling, which was delivered orally at the close of the evidence at the suppression hearing and after argument by counsel, as applicable also to the search of the filing cabinet within the garage office. Defendant, however, argues that the officers should not, in any event, have opened the filing cabinet. He asserts that only when "a legitimate search is under way, and when its purpose and its limits have been precisely defined . . . ." may a search of containers within the room be valid, relying on United States v. Ross, 456

10

U.S. 798, 821 (1982), and United States v. Salinas-Cano, 959 F.2d 861 (10th Cir. 1992). Defendant apparently contends that the purpose and limits of the search were not precisely defined. We find it unnecessary to address the issue as framed by the defendant, however, because we believe that the search was reasonable even assuming, *arguendo*, that Mrs. Bain's actual authority did not extend to the filing cabinet.

Even if Mrs. Bain's authority did not extend to the filing cabinet, the search is nevertheless reasonable if the officers reasonably believed that she had authority to consent to its search. See Salinas-Cano, 959 F.2d at 865; Illinois v. Rodriguez, 497 U.S. 177 (1990). The test is what a reasonable person would have understood was the extent of the permission granted. United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994).

The evidence was that Mrs. Bain readily consented to the search of the garage. Officer Mize testified that when the search was conducted, the door to the office was open. V. R. at 326. With two refrigerators in the small room, there is no indication that the room itself would have appeared to the officers to have been anything other than an area of common access for the family. The filing cabinet was the only object in the room that would have suggested use of the room as an office, and the presence of the refrigerators would have dispelled such an impression. The filing cabinet was not marked in any way to indicate whether it was used by Mr. Bain exclusively, or even that it was used by him at all.

As the Supreme Court has often emphasized, Fourth Amendment questions such as this depend on all the relevant facts and circumstances in the individual case. We

11

acknowledge that a relevant factor is whether the container in issue is the type which "historically command[s] a high degree of privacy," Salinas-Cano, 959 F.2d at 864, and that filing cabinets in general must be considered as having such a high degree of privacy. Under the specific circumstances confronting the officers in this case, however, we believe that there was little, if anything, to indicate that this filing cabinet was the private domain of Mr. Bain individually, as opposed to the Bain family. Therefore, we hold that it was reasonable for the officers to believe that Mrs. Bain's consent extended to the cabinet and to act accordingly.

**IV**

We turn next to Mr. Bain's contention that the evidence of statements he made to the FBI agents after his arrest should not have been admitted. Bain does not contest the factual findings underlying the district court's denial of his motion to suppress. Thus, we deal only with the legal issue of the voluntariness of defendant's statements, which we review *de novo*. See United States v. Griffin, 7 F.3d 1512, 1516 (10th Cir. 1993).

It is undisputed that defendant was in custody when the statements were made. Nevertheless, the fact that defendant had not yet been advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), is material only if the statements were the result of interrogation. Defendant relies on Rhode Island v. Innis, 446 U.S. 291, 301 (1980), and its holding that any activity by law enforcement officers "reasonably likely to elicit an incriminating response," constitutes interrogation and so requires Miranda warnings. He

12

contends that the agents' conduct in this case was reasonably likely to elicit an incriminating response due to the fact that he had just been arrested and told that he was being held for bank robbery charges. This contention is meritless.

A command by officers to an arrestee not to speak, after which the officers say no more, cannot possibly be construed as interrogation. To hold otherwise would require Miranda warnings in virtually every case immediately upon arrest and effectively eliminate the requirement of interrogation from the Miranda analysis. The Supreme Court has given no indication that the interrogation requirement should be so jettisoned.

Comparison of the facts of this case with those of Innis further reveals the weakness of defendant's argument. The Court there stated the abstract rule on which Mr. Bain relies -- that Miranda applies not just to interrogation *per se* but to other words or conduct reasonably likely to elicit an incriminating response -- but found that the officers discussion of the potential tragedy which might befall an innocent, handicapped child did not constitute the type of conduct which would amount to interrogation. If that conversation in Innis did not meet the standard of being reasonably likely to elicit an incriminating response, then certainly the agents' silence in this case does not.

Here, the officers did nothing except remain silent (after first warning defendant not to talk), while defendant apparently gushed forth in his anxiety. The statements were voluntary and so properly admitted.

**V**

13

Bain argues that the evidence was insufficient to support his convictions. We review the evidence *de novo*, in the light most favorable to the government, and all reasonable inferences to be drawn from the evidence, to determine if a rational jury could have found the defendant guilty beyond a reasonable doubt. United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir.), cert. denied, 117 S. Ct. 226 (1996).

Defendant relies on the fact that none of the witnesses at the bank was able to identify him and on certain discrepancies in their descriptions of the robber's attire. He also emphasizes differences in the clothing worn by the robber, as seen on the bank's security camera, and the clothing he was wearing at the time of his arrest. Thus, on the bank's videotape, the robber appears to be wearing dark shoes and dark pants. One witness said the robber was wearing cowboy boots. When he was arrested, Bain was wearing light colored sneakers and cut-off jeans. No red dye was found on the clothes he was wearing when arrested, nor on his person. His fingerprints were not found on the paper bag in which the money was found or on the shotgun, but the evidence was that the robber had worn gloves like those found in the car. Bain also points out that there was a discrepancy in the amount of money reported stolen and the amount recovered, which is not resolved by the amount that he had in his possession when he was arrested. Finally, Bain points to certain inconsistencies in the testimony of Officer Neal and a library patron concerning a conversation that Neal testified he had just before entering the library. From this inconsistency, Bain argues that Neal's testimony was "contrived" and must be disregarded.

14

We dispose of the last mentioned contention first. We are not at liberty to resolve discrepancies in evidence, nor to declare that the jury should have disregarded a witness's testimony. See United States v. Torres, 53 F.3d 1129, 1134 (10th Cir.), cert. denied, 115 S. Ct. 2599, 116 S. Ct. 220 (1995). Indeed, much of Bain's attack on the sufficiency of the evidence consists of identifying discrepancies which the jury could have resolved in his favor but, evidently, did not. We need say no more on these portions of the argument but that our role as an appellate court does not permit us to second-guess the jury's resolution of issues properly put to it.

The evidence is overwhelming that it was defendant's car which was used in the robbery. The only possible inference other than that the defendant committed the robbery is that, as defendant claimed in his voluntary statements immediately after his arrest, someone had stolen his car and returned it to the library. Because Officer Neal followed the getaway car to the library only seconds behind it, the actual perpetrator, if not defendant, would have had to make a very quick escape, after going through the library to dispose of the keys to the car. Although this is a possible inference, the mere possibility of an inference other than guilt does not mean that the jury's verdict should, or even may, be overturned. To the contrary, "the evidence required to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." United States v. Mains, 33 F.3d 1222, 1228 (10th Cir. 1994) (quoting United States v. Parrish, 925 F.2d 1293, 1297 (10th Cir. 1991)); see also United States v. Hager, 969 F.2d 883, 888 (10th Cir.

15

1992). We are not convinced that the inference that defendant would have us draw is a reasonable one in view of the evidence as a whole, but defendant's argument is unavailing in any event.

Moreover, we conclude that the discrepancies identified by defendant were easily susceptible of resolution by the jury by drawing reasonable inferences other than those suggested by Mr. Bain. For example, some minutes elapsed between the time Officer Neal arrived at the library and the time that Bain was first seen in the library, which could have enabled him to complete the change of clothing which he apparently had begun before, when he removed and left in the car the outer shirt worn during the robbery. Discrepancies between the witnesses' descriptions were not material, and not inconsistent with the inference that Bain was indeed the robber. We do not believe it necessary to set out with specificity the fairly obvious, adverse inferences which the jury evidently drew with respect to the other evidentiary matters Bain discusses in his brief. Suffice it to say, we find the evidence sufficient to support the jury verdict of guilty on all the counts under our standards for review set out above.

## VI

Finally, we consider defendant's argument that the stolen license plate found in the trunk of his car at the library after his arrest should have been excluded under Fed. R. Evid. 404(b). We review the district court's evidentiary ruling for abuse of discretion. United States v. Reddeck, 22 F.3d 1504, 1509 (10th Cir. 1994). Our abuse of discretion review

16

under Rule 404(b) follows the four-step procedure established by <u>Huddleston v. United States</u>, 485 U.S. 681, 691-92 (1988):

> (1) [T]he evidence must be offered for a proper purpose under Rule 404(b); (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination that the probative value of the [other crimes, wrongs, or acts] evidence is not substantially outweighed by its potential for unfair prejudice; and (4) under Rule 105, the trial court must, upon request, instruct the jury that the evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

<u>United States v. Joe</u>, 8 F.3d 1488, 1495 (10th Cir. 1993).

The district court held that the stolen license plate was relevant because it was more likely that a person with a stolen license plate, double taped, bearing his fingerprint, robbed the bank than a person who did not have such an item in his car. The court held that the probative value of this evidence was not outweighed by the potential for unfair prejudice.

Defendant argues that the evidence was not relevant and it was unfairly prejudicial. Mr. Bain contends that because there was no evidence that the license plate was actually used in the robbery, the license plate had no relevance to the only issue -- the identity of the robber. He asserts that this evidence was used as a character attack, to try to get the jury to convict because he was a bad person. Thus, Mr. Bain challenges the first three of the four factors set out above for our review.

The government responds that the evidence was indeed relevant and was admissible under Rule 404(b) to show intent, preparation, or plan. The license plate had been taped on the back so that it could be quickly placed over another plate. Detective Mize testified that

17

it was common for robbers to use a stolen vehicle or to use a changed or stolen license plate on their own vehicle. The presence of the license plate was particularly relevant, the government says, in view of defendant's statement that someone must have stolen his car and used it in the robbery. The government argues, and cites supporting testimony by Detective Mize, that a criminal using a stolen car would not ordinarily also use a stolen license plate.

The government also says that the evidence about the plate was not unfairly prejudicial and cites the district judge's observation that the gun, the money, the ski mask and other items found in the search of the car would have more impact on the jury than this item, which is not inflammatory and not the type of thing that would tip the scales in a close case.

We agree that the evidence was relevant to show preparation or planning by the defendant and, because we do not believe the probative value of the evidence was outweighed by the relatively slight possibility of unfair prejudice, we certainly see no abuse of discretion in the district judge's ruling.

## VII

Having found no merit in any of Mr. Bain's contentions, we **AFFIRM** his conviction and sentence**.**

Entered for the Court


William J. Holloway, Jr.
Circuit Judge