FILED
United States Court of Appeals
Tenth Circuit

December 20, 2007

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENK CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellant,

v.

No. 06-5223

SHEQUITA REVELS,

     Defendant-Appellee.

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 06-CR-159-HDC-2)**

Richard A. Friedman, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C. (David E. O'Meilia, United States Attorney; Janet S. Reincke, Assistant United States Attorney, Tulsa, Oklahoma, with him on the briefs), for Plaintiff-Appellant.

J. Lance Hopkins, CJA Panel Member, Tahlequah, Oklahoma, for Defendant-Appellee.

Before **LUCERO**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

**LUCERO**, Circuit Judge.

In this interlocutory appeal, the United States seeks review of a district

court's pretrial order suppressing several incriminating statements made by

Shequita Revels as having been obtained in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). The sole issue before us is whether Revels was "in custody" at the time she made the statements at issue. Because we conclude that a reasonable person in Revels' position would have considered her freedom of movement to be restricted to a degree consistent with formal arrest, we hold that Revels was in custody for Fifth Amendment purposes and that she should have been advised of her <u>Miranda</u> rights. Exercising jurisdiction under 18 U.S.C. § 3731, we take the district court's view of the matter and **AFFIRM** its decision to suppress the incriminating statements.

**I**

**A**

Based on information provided by a confidential informant, officers from the Tulsa, Oklahoma Police Department ("TPD") and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") obtained a warrant to search a residence belonging to Marco Dewon Murphy and his girlfriend, Shequita Revels. The informant indicated that Murphy possessed a large amount of cocaine and that he was selling the drug from the joint residence.[1] On August 2, 2006, at approximately 6:00 a.m., seven officers from TPD and ATF gathered to execute the search warrant at the couple's home. When no one answered the door after

---

[1] Murphy was the only individual identified as a target in the search warrant.

officers knocked and announced their presence, the police forcibly entered the residence. Once inside, the officers encountered Murphy and Revels, whom they immediately handcuffed and placed face down on the floor in the hall near the main living room. The officers then found a young girl and a small infant in separate bedrooms in the house. As soon as the officers had located all of the occupants of the home and otherwise secured the scene, they began their search for contraband.

Having been roused from her bedroom in the early hours of the morning, Revels was dressed only in her underwear when officers first detained her. After approximately ten minutes of searching the home, however, the police removed Revels' handcuffs and escorted her to a rear bedroom where they permitted her to dress. They also allowed Revels to care temporarily for her infant, who required feeding through a tube inserted into his stomach. Once Revels had dressed herself and cared for the child, an officer escorted her back to the living room, where she remained with Murphy and the two children for a short time while the officers continued their search of the residence. Revels was not again placed in handcuffs at this point in time.

During the course of the search, officers seized several items of potential evidence. They found 251 grams of cocaine powder and $6,014 in cash in an open safe located in one of the rooms. They also discovered approximately 45 grams of crack cocaine hidden in a coffee can with a false bottom, as well as

paraphernalia used in manufacturing crack cocaine. Finally, officers found a loaded semiautomatic handgun "lying on the headboard" of the bed that Revels and Murphy shared.

After approximately 30 minutes, the officers had substantially completed their search efforts and uncovered all of the material evidence. At that time, the officers decided to separate the two adults in order to interview each. According to ATF Special Agent McFadden, the police intended to interview Revels and Murphy to determine whether they "would be willing to cooperate with the investigation." Revels was interviewed first. Agent McFadden and TPD Detectives Hickey and Henderson escorted her to a bedroom in the rear of the home, and closed the door behind them. Murphy and the two children remained in the main living room under the supervision of the other officers. Revels was free from handcuffs at this time, and had not been told by any of the officers whether she was under arrest. Each of three officers who took Revels to the back bedroom was armed, but none had a weapon drawn. Inside the bedroom, there were no chairs or other places to sit; Revels and the officers stood during the ten to twelve minutes of questioning.

Revels' questioning began with Agent McFadden's explanation that the police were executing a state search warrant at the residence and that, during their search, they had discovered narcotics and a loaded firearm. Agent McFadden then asked Revels whether she "would be willing to cooperate" with their

investigation. Revels answered the agent's question with several incriminating statements. She stated that she knew Murphy was selling drugs from the residence and that Murphy had recently obtained the handgun to protect her and the children from the threat of robbery.[2] After Revels offered these initial responses to the officer's question, Agent McFadden and Detective Henderson left the rear bedroom for a short time; both Revels and Detective Hickey remained behind. Detective Henderson then returned to the room a few moments later, conspicuously carrying a bag of cocaine that had been seized during the officers' search of the residence. According to Detective Henderson, Revels responded to this action by making another incriminating statement. She stated: "Oh, my god I didn't know he had that much."[3] Indisputably, the officers did not advise Revels of her <u>Miranda</u> rights at any time before or during this questioning.

Once the officers had completed their interview with Revels, they escorted her back to the main living room and took Murphy to the bedroom for a similar interview. Around that same time, a family member arrived and was asked to care for the two young children. The officers then told Revels that she was under arrest, handcuffed her, and transported her, along with Murphy, to the police

---

[2] For purposes of this appeal, the government agrees that Revels' response to Agent McFadden's question consisted of incriminating statements.

[3] The government also admits that Revels' response to Detective Henderson's action with the bag of cocaine constituted an incriminating statement.

station.  Only upon arriving at the station was Revels advised of her rights under Miranda, which prompted her to immediately request legal counsel.

**B**

On September 7, 2006, a federal grand jury indicted Revels on three counts: (1) possession with intent to distribute five grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B)(iii); (2) possession of cocaine with intent to manufacture crack cocaine in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C); and (3) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).  Revels entered a plea of not guilty to all charges.

Prior to her scheduled trial, Revels filed a motion to suppress the incriminating statements that she made while officers interviewed her in the rear bedroom of her home on the day of her arrest.  She argued that the government had obtained the statements in violation of her Fifth Amendment right against self-incrimination, as articulated by the Supreme Court in Miranda.  Specifically, Revels contended that because she had been subjected to a custodial interrogation and had not been advised of her rights under Miranda prior to the interview, the statements she made were not voluntary within the meaning of the Fifth Amendment.  See 384 U.S. at 444-45.  The government responded to the motion by asserting that Revels was not in custody at the time of the interview and that she had not been interrogated by the officers.

- 6 -

At the suppression hearing, the district court received testimony from both Agent McFadden and Detective Henderson. Finding that the search had been completed and the incriminating evidence uncovered before the officers escorted Revels to the rear bedroom for an interview, the court concluded that Revels was subjected to a custodial interrogation for purposes of the Fifth Amendment. It ordered that because the officers had not advised Revels of her rights under Miranda, her incriminating statements would be suppressed and could not be admitted at trial.

In seeking reconsideration, the government argued that Revels was subject only to an "investigative detention" at the time of her interview, and that she was therefore not "in custody" for Fifth Amendment purposes. The district court denied the government's motion for reconsideration, and the government subsequently brought this timely interlocutory appeal under 18 U.S.C. § 3731.

**II**

"It is well established that 'police officers are not required to administer Miranda warnings to everyone whom they question.'" United States v. Erving L., 147 F.3d 1240, 1246 (10th Cir. 1998) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). Rather, as the Supreme Court held in Miranda, police officers must so advise individuals only when they are subject to a "custodial interrogation." 384 U.S. at 444-45. Miranda thus established a two-part analysis for determining when the prescribed procedural safeguards must be provided: (1)

the individual must be in custody, and (2) the individual must be subjected to questioning that meets the legal definition of interrogation. United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993). Because the government concedes on appeal that the police "interrogated" Revels when they questioned her in the rear bedroom, we need only determine whether Revels was "in custody" when she made the incriminating statements at issue.

A suspect is in custody for purposes of Miranda if the suspect has been "deprived of [her] freedom of action in any significant way." 384 U.S. at 444. Such a deprivation occurs when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). Our analysis of the circumstances is an objective one; we ask whether "a reasonable [person] in the suspect's position would have understood [her] situation . . . as the functional equivalent of formal arrest." Id. at 442. We review de novo the district court's determination that an individual is in custody, but we give deference to the district court's findings of fact and to its credibility determinations. United States v. Rogers, 391 F.3d 1165, 1169 (10th Cir. 2004); see also Erving L., 147 F.3d at 1246.

**A**

Before applying a reasonable person inquiry to the facts, we first address the government's primary argument against suppression. According to the

government, the officers held Revels under a permissible "investigative detention" when they questioned her in the rear bedroom, and therefore did not have a duty to advise Revels of her <u>Miranda</u> rights prior to their interrogation. By characterizing Revels' detention in Fourth Amendment terms (i.e., "investigative detention"), the government asks us to conflate <u>Miranda</u>'s traditional "in custody" inquiry with the analysis we use to determine whether the "seizure" of a criminal suspect is reasonable under the Fourth Amendment. As a matter of precedent, however, both the Supreme Court, in <u>Berkemer</u>, and this court, in <u>United States v. Perdue</u>, have definitively foreclosed any attempt to equate the two analytically distinct inquiries. <u>See</u> <u>Berkemer</u>, 468 U.S. at 435-42; <u>Perdue</u>, 8 F.3d at 1461-66.

In <u>Berkemer</u>, the Supreme Court held that motorists subjected to garden-variety traffic stops—reasonable seizures within the meaning of the Fourth Amendment—are not entitled to <u>Miranda</u> warnings. <u>Berkemer</u>, 468 U.S. at 440. In reaching this determination, the Court applied the standard <u>Miranda</u> inquiry, concluding that "the atmosphere surrounding an ordinary traffic stop is substantially less 'police-dominated' than that surrounding the kinds of interrogation at issue in <u>Miranda</u> itself . . . ." <u>Id.</u> at 438-39. It acknowledged that when compared to formal interrogations, ordinary traffic stops are "comparatively nonthreatening" and "noncoercive" in character. <u>Id.</u> at 440. The Court also recognized, however, that when a given traffic stop becomes more coercive than a routine traffic stop, police may well be required to advise a suspect of his

Miranda rights even though the underlying seizure of the individual might qualify as a reasonable investigative detention under the Fourth Amendment. See id. ("If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda."). In drawing a distinction between an ordinary traffic stop and those detentions where coercion is present, the Supreme Court implicitly, if not explicitly, appreciated a critical fact: Although some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the Fourth Amendment, those same detentions may nonetheless create the custodial situation in which Miranda was designed to operate.

In Perdue, we faced the precise scenario contemplated by the Supreme Court in Berkemer and unequivocally recognized the analytical distinction between the Fourth Amendment reasonableness analysis and Miranda's in custody inquiry. We inquired in Perdue whether several incriminating statements made by a criminal defendant had been admitted in violation of either the defendant's Fourth or Fifth Amendment rights. 8 F.3d at 1464. While executing a search warrant in a remote area, officers observed a vehicle approach the rural property where the search was being conducted and then immediately reverse direction upon spotting the police. Id. at 1458. Aware that the search had uncovered weapons, two of the officers present stopped the vehicle and ordered the

occupants, at gunpoint, to exit and lie face down on the ground. Id. With their guns drawn and the driver lying prone on the road, one of the officers began to question the driver, Perdue, who responded to the officer's inquiries by making several incriminating statements. Id. at 1459.

We held on appeal that the officers' detention of Perdue was reasonable under the Fourth Amendment as a lawful investigative detention. Id. at 1463. Both the officers' concerns for their own safety and their reasonable suspicion that Perdue had committed a crime justified the intrusiveness of their actions for purposes of the Fourth Amendment. Id. Notwithstanding our Fourth Amendment ruling, we also held, for purposes of the Fifth Amendment, that the officers' very same actions in detaining Perdue "created the 'custodial' situation envisioned by Miranda and its progeny." Id. at 1464. Noting that "[a]ny reasonable person in Mr. Perdue's position would have felt 'completely at the mercy of the police'" at the time of his detention, we concluded that Perdue was in custody as a matter of law when he made the incriminating statements. Id. at 1465 (quoting Berkemer, 468 U.S. at 438). We thus recognized, consistent with Berkemer, that whether an individual is subject to a lawful investigative detention within the meaning of the Fourth Amendment does not necessarily answer the separate question of whether a suspect is in custody for purposes of Miranda.

In short, both Berkemer and Perdue establish that merely because a particular police-citizen encounter can be neatly packaged under the label

- 11 -

"investigatory detention" for purposes of the Fourth Amendment, it does not necessarily follow that police are freed of their obligation to inform the citizen of her rights under Miranda in appropriate cases. Consequently, and counter to the government's argument, whether the police subjected Revels to a lawful investigative detention in this case is not dispositive of whether the officers should have advised Revels of her Miranda rights. See Berkemer, 468 U.S. at 441-42 ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); see also Perdue, 8 F.3d at 1463-66; United States v. Smith, 3 F.3d 1088, 1097 (7th Cir. 1993).

**B**

We turn then to the proper question raised—whether, within the meaning of the Fifth Amendment, Revels was in custody at the time she made the incriminating statements at issue. Taking into account the totality of the circumstances, we must decide whether a reasonable person in Revels' position would have understood her freedom of action to have been restricted to a degree consistent with formal arrest. See Berkemer, 468 U.S. at 442. In engaging in this analysis, we ignore the subjective views of the interrogating officers and focus only on what a reasonable person would have understood from the situation. See Stansbury v. California, 511 U.S. 318, 323 (1994) (per curiam). Several relevant factors inform our fact-specific analysis, including: (1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the

- 12 -

nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made Revels aware that she was free to refrain from answering questions, or to otherwise end the interview. See United States v. Griffin, 7 F.3d 1512, 1518-19 (10th Cir. 1993). Considering these factors in light of the record before us, we conclude that the officers should have advised Revels about the procedural safeguards required by Miranda before initiating their questioning.

First, a reasonable person in Revels' position would have perceived a police-dominated atmosphere. Relatively early in the morning, at approximately 6:00 a.m., seven police officers abruptly roused Revels and Murphy from their bedroom after forcibly entering their home. Revels was immediately detained, restrained in handcuffs, and placed face down on the floor. She was made to sit under the supervision of officers while police executed the search warrant. Then, before any questioning began, three male officers separated Revels from her boyfriend and two children, and escorted her to a rear bedroom for questioning. Once inside the room, the officers isolated Revels from the other occupants of the home, and closed the door behind her. For much of the interview, all three of the officers remained in the room with Revels. Taken together, these facts demonstrate that the police were unequivocally in control of the circumstances both before and during Revels' questioning. See Griffin, 7 F.3d at 1519 (noting that relevant circumstances for finding custody include "separation of the suspect from family or colleagues who could offer moral support . . . [and the]

- 13 -

threatening presence of several officers"); United States v. DiGiacomo, 579 F.2d 1211, 1214 (10th Cir. 1978) (holding that Miranda warnings were required when, among other things, the "[d]efendant was kept apart from his companion," and "was confronted simultaneously by four federal agents"); see also United States v. Mittel-Carey, 493 F.3d 36, 39-40 (1st Cir. 2007) (finding custody for Miranda purposes in part because police officers conducted a search of the defendant's home at an early hour of the morning and exercised physical control over the defendant during that search).

That Revels was in her own home at the time of the interview does nothing to alter our conclusion that this was a police-dominated environment. We accept that the home is generally a more familiar, comfortable atmosphere than a police interrogation room. See United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994) ("[C]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." (quotations omitted)). However, the facts belie any conclusion that Revels' home, on the morning of the questioning at issue, was the traditional comfortable environment that we normally would consider a neutral location for questioning. The police had recently breached Revels' front door with force, handcuffed her, and placed her prone on the hall floor. Officers had also discovered a substantial amount of evidence relating to the distribution of drugs while Revels sat under their supervision. Given the temporal proximity of her

- 14 -

initial detention and the overall development of events that morning, we decline to accord formalistic significance to the fact that the interrogation occurred in Revels' own home. See, e.g., Mittel-Carey, 493 F.3d at 40 ("While an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody, . . . the level of physical control the agents exercised . . . weighs heavily in the opposite direction."); Sprotsy v. Buchler, 79 F.3d 635, 641 (7th Cir. 1996) ("More important than the familiarity of the surroundings where [the defendant] was being held is the degree to which the police dominated the scene."); United States v. Griffin, 922 F.2d 1343, 1354-55 (8th Cir. 1990) ("Questioning which occurs in the suspect's own home may provide a margin of comfort, but . . . the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting."); see also Orozco v. Texas, 394 U.S. 324, 326-27 (1969) (holding that a suspect within his own residence was in custody for Miranda purposes). Nor does the limited freedom that the officers afforded Revels by allowing her to dress herself and tend to her infant alter our conclusion that the atmosphere in the home was dominated by the police. Handcuffed or not, Revels reasonably understood that the officers were unambiguously in control of the events, and that she was not free to leave. See Griffin, 7 F.3d at 1518-19 ("Where police are in full control of the questioning environment, custody is more easily found.").

Second, the nature of the questioning indicates that Revels was in custody. Officers purposefully separated Revels from her boyfriend and children and removed her to a back room. Then, once Revels was inside the room, one of the officers confronted her with a bag of cocaine that had been seized during the search. Although she was not questioned directly on point, it is difficult to ignore the effect that this display of the recently seized drugs had on the tone of the interrogation. Cf. United States v. Rith, 164 F.3d 1323, 1332 (10th Cir. 1999) (holding that a suspect "was not in police custody until the point at which he was confronted with the illegal shotgun"). After being confronted with the drugs in an accusatory manner, we have no doubt that Revels would have reasonably felt compelled to cooperate with the police.

Turning to the third factor, the police never indicated to Revels that she was free to leave or otherwise at liberty to terminate the police questioning. Although none of the officers expressly told Revels that she was under arrest, they did not indicate to the contrary.[4] See Griffin, 7 F.3d at 1518 ("[T]he lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention."). This is

[4] Revels devotes much of her argument to the fact that Agent McFadden testified at the suppression hearing that Revels was not free to leave at any point in time. Because Agent McFadden never disclosed this viewpoint to Revels, however, we decline to consider the agent's subjective understanding of the situation. See Stansbury, 511 U.S. at 324 ("It is well settled . . . that a police officer's subjective view, . . . if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda.").

particularly significant given that police had just engaged in an intrusive search warrant operation in Revels' home and had earlier placed Revels in handcuffs. In the face of the officers' dominance of the scene throughout the 30 minutes before her interview, Revels would have reasonably assumed that she was not free to leave her home or otherwise decline an interview with the officers.

We also consider it significant that the district court specifically found that the search had been completed prior to Revels' questioning. With the search concluded, there was little remaining for the officers to do inside the home other than to formally place Revels and Murphy under arrest. Considering the extensive discovery of evidence, an arrest was likely and a reasonable person in Revels' position would have recognized as much.

Taking the totality of the circumstances into account, we conclude that a reasonable person in Revels' position would have considered herself under a degree of restraint equivalent to formal arrest and that officers should have extended Miranda advisements prior to their questioning. The undisputed facts demonstrate that the officers' actions created the type of coercive environment that Miranda was designed to address.

### III

For the forgoing reasons, we **AFFIRM** the district court's decision to suppress Revels' statements.