FILED
United States Court of Appeals
Tenth Circuit

April 20, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ERNEST FRED,

    Defendant-Appellant.

No. 08-2052

(D.C. No. CR-05-801-JB)
(D.N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY, HOLLOWAY,** and **BRISCOE**, Circuit Judges.

---

Defendant Ernest Fred, convicted and sentenced for two counts of aggravated sexual abuse within Indian country, in violation of 18 U.S.C. §§ 2241(c), 2246(2)(D), and 1153, appeals the denial of his motion to suppress oral and written statements and his subsequent conviction and sentence. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and reverse and remand with directions to vacate.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I

In approximately 1993, Fred obtained sole custody of his four children from his first marriage, including his daughter who was the victim in this case, "N.F." The children moved to Fred's house, located on Navajo land east of Gallup, New Mexico, where they lived with Fred and his wife, Barbara McClanahan. A few years later, N.F. moved to live with her grandmother (Fred's mother, Elsie Fred), so that Elsie could raise N.F. according to Navajo traditions. Fred and McClanahan still saw N.F. daily, and N.F. slept occasionally at Fred's house.

In the fall of 2004 while N.F. was in junior high school and living with Elsie, she was caught smoking marijuana at school. When the school authorities were unable to contact N.F.'s family, N.F. was transferred from the junior high school to a juvenile detention center in Gallup. While at the detention center, N.F. told a counselor that Fred had touched her in a sexually inappropriate way. This information was reported to social services and the Federal Bureau of Investigation ("FBI"). FBI Special Agent Devon Patrick Mahoney interviewed N.F., and she alleged that Fred had sexually molested her on three occasions, including touching her vagina on two of those occasions. N.F. later testified at Fred's trial that Fred only touched her vagina on one of those occasions.

When N.F. failed to arrive home from school, Fred and McClanahan reported N.F. missing. They had been searching for her for about six days when

someone from social services informed Fred and McClanahan that they would need to speak with the FBI regarding N.F. On December 8, 2004, they went to the FBI office in Gallup. Fred was interviewed by Mahoney and another agent, Robert Sayegh, in a conference room on the first floor. Fred wanted McClanahan, who was the better English speaker, to accompany him to the interview, but the agents would not allow McClanahan to enter the interview room. McClanahan waited in the lobby during the interview. Fred sat with his back to the door of the conference room, and Mahoney closed the door for the interview. Fred could not see the door from his position, but the door had no lock and was open six or seven inches during the interview. The interviewing agents were dressed casually, but their weapons and badges were visible. Fred was not advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). At the start of the interview, Mahoney "thanked [Fred] for coming voluntarily . . . [and] told him that he was not going to be under arrest, he was going to be able to leave when he was done." ROA, Vol. II, at 13-14. The agents then questioned Fred about his alleged sexual abuse of N.F. According to Mahoney, the interview lasted about an hour and a half. Fred was not arrested, nor placed in handcuffs.

It was the FBI's general practice not to record interviews, and Fred's interview was not recorded. At the end of the interview, Mahoney asked Fred if he would give a written statement. Mahoney testified that Fred told him that Fred "didn't have a problem with providing a statement, but he didn't feel comfortable

3

writing it." Id. at 18. Fred agreed that Mahoney could write the statement in Fred's words. The substance of Fred's statement is as follows:

> I'm sorry to my daughter [N.F.]. Remember the time where I told you that we had conversation and we talked. I'm sorry that as a father I probably took things to where it wasn't supposed to go to. I'm sorry we touched each other, probably wasn't right. I want you back and I want you to go see a medicine man. Grandma wants a traditional ceremony for you.

Id. at 24; Aplt. Br., Ex. A.

Mahoney testified at the suppression hearing that Fred had stated during the interview that "[Fred] had touched his daughter in inappropriate ways on two occasions, and then he went into those two occasions and what he did." Id. at 17. Fred did not testify at the suppression hearing, but he denied sexually abusing his daughter at trial. More specifically, at trial Fred only described an incident where he searched for drugs on N.F.'s body and found two joints and a little tube just under her waistband, in the fold of skin below her stomach.

Fred had graduated from Gallup High School, where classes are taught in English. Mahoney testified that Fred spoke English "very well" and the conversation was free-flowing. ROA, Vol. II, at 15. McClanahan testified that Fred spoke mostly in Navajo around the house, but that he understood her when she spoke in English. However, McClanahan also testified that Fred did not always understand "Anglo ways." Id. at 91.

The district court, at the conclusion of the suppression hearing, determined

4

that Fred was not in custody when he was interviewed, and therefore <u>Miranda</u> warnings were not required prior to his questioning. Accordingly, the court denied Fred's motion to suppress the oral and written statements he made to the FBI. A jury trial was held, and on December 6, 2006, the jury found Fred guilty of both counts of aggravated sexual abuse with children within Indian country, in violation of 18 U.S.C. §§ 2241(c), 2246(2)(D), and 1153. Fred was sentenced to 292 months of imprisonment, 5 years of supervised release, and a special assessment of $200.

## II

Fred raises three issues on appeal: (1) the district court erred by denying Fred's motion to suppress his oral and written statements to the FBI, which were made in violation of <u>Miranda</u>, or, alternatively, his statements were involuntary in violation of Fifth Amendment due process; (2) there was insufficient evidence to support his convictions; and (3) the district court erred at sentencing by applying a five-level increase to Fred's calculated offense level for pattern of abuse under U.S.S.G. § 4B1.5(b)(1) and by not granting Fred a downward variance from the calculated sentencing guidelines range.

As outlined below, we conclude that the district court erred in denying Fred's motion to suppress. The district court should have suppressed Fred's oral and written statements because they were made in violation of <u>Miranda</u>. As this error was not harmless, we need not reach the remaining issues on appeal.

5

*Suppression of Oral and Written Statements*

Fred contends his statements to the FBI should be suppressed because he was not informed of his rights before interrogation in a custodial setting, in violation of <u>Miranda</u>. Specifically, Fred argues that the district court erred by concluding that he was not in custody when questioned by the FBI on December 8, 2004. We agree.

In reviewing a district court's ruling on a motion to suppress, we accept any factual findings made by the district court unless they are clearly erroneous. <u>United States v. Griffin</u>, 7 F.3d 1512, 1516 (10th Cir. 1993). Additionally, the facts are viewed in the light most favorable to the prevailing party, the government in this case. <u>United States v. Hudson</u>, 210 F.3d 1184, 1190 (10th Cir. 2000). We review de novo the district court's determination that Fred was not in custody when he was questioned. When conducting our de novo review, we give "proper deference to the district court's findings of historical fact and credibility determinations." <u>United States v. Erving L.</u>, 147 F.3d 1240, 1246 (10th Cir. 1998).

Police must advise suspects of their <u>Miranda</u> rights prior to custodial interrogation. <u>Miranda</u>, 384 U.S. at 444. The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Id.</u> Both parties agree that Fred was interrogated

6

by the FBI, but the parties disagree concerning Fred's custodial status during that interrogation.

The determination of custody is based on the totality of the circumstances, and can include the following non-exhaustive factors:

> [1. T]he extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will[;] . . . [2. T]he nature of questioning, where prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave[;] . . . [and, 3. W]hether police dominate the encounter.

United States v. Jones, 523 F.3d 1235, 1240 (10th Cir. 2008) (internal quotations, alterations, and citations omitted). Additionally, there are many subfactors we may consider to determine whether police dominate the encounter:

> Separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

Id. (bracket omitted).

The district court noted the following facts to support its conclusion that Fred was not in custody at the time of his interrogation:

> Fred responded to a request by law enforcement officials to meet for an interview. Law enforcement officials did not transfer Fred to the FBI office in Gallup, and he was not required to be there at any particular time. The interview took place—not in an interrogation room—but

7

> in a conference room that FBI personnel used, and the door to the conference room remained slightly ajar. Significantly, the officers told Fred that he was free to leave at any time, he was not handcuffed or placed under arrest, and at the conclusion of the interview–which lasted approximately one and a half to two hours–he was allowed to leave with his wife. Finally, the written statement that Fred eventually signed was labeled "Non-Custodial," a designation Fred presumably understood based on his established degree of education and literacy.

ROA, Vol. I at 51-52 (Doc. 68 at 12-13).

Some of these factual findings are supported by the record and are not clearly erroneous. Specifically, McClanahan testified at the suppression hearing that social services informed Fred that the FBI wanted to talk to them. Mahoney testified that Fred voluntarily came to the FBI office without an appointment. The length of the interview was approximately an hour and a half.

Three facts found by the district court are not clearly erroneous, but should not be given great weight when determining whether Fred was in custody. First, it is true that Mahoney interviewed Fred in a conference room, rather than the other interview room in the FBI office equipped with a bolted door and bar to which a suspect may be handcuffed. However, as regards whether Fred thought he was in custody or not, it would make no difference to a reasonable person in his position that the FBI agents knew there were two rooms–one labeled a "conference" room and one labeled a "custodial" room. The conference room where Fred was interviewed was separate from the rest of the FBI office, small,

8

enclosed, and Fred was separated from McClanahan. Second, it is also true that the door to the conference room was partially open during the interview. However, Fred's back was to the door, so he reasonably could have thought that the door was closed. Third, it is uncontroverted that at the conclusion of the interview, Fred signed a written statement on the FBI's "non-custodial" form that included the following language: "I was also advised by SA Mahoney that I was not under arrest, that I did not have to answer questions or provide information, and that I was free to leave (or could ask the interviewing agents to leave) at any time." Aplt. Br., Ex. A. However, this form was not presented to Fred until his interview was concluded, after he had already been in custody for over an hour. Even if the non-custodial form informed Fred of his rights at the time it was given to him, it was received at the end of his interview and did nothing to alter the custodial nature of his encounter with the agents.

One key factual finding made by the district court, that Fred was aware that he was free to leave at any time, is clearly erroneous. The direct examination of Mahoney by the prosecution at the suppression hearing was as follows:

> Q: You explained to Mr. Fred that he wasn't under arrest and free to leave at any time?
>
> A: I did. At the beginning of the interview, since he had come without an appointment or anything like that, I thanked him for coming voluntarily, I thanked him, you know, that – to come in, because we did want to talk to him at some point. I told him that he was not going to be under arrest, <u>he was going to be able to leave when</u>

9

he was done here.

ROA, Vol. II, at 13-14 (emphasis added). Fred's ability to leave when he was done with the interview, as Mahoney testified, is quite different than Fred's ability to leave at any time, as the district court erroneously found. We agree that the emphasized portion of Mahoney's testimony "resounds more as a compulsion that he is not leaving until he talks." Aplt. Br. at 17. Mahoney's testimony does not support the district court's conclusion that Fred was informed he was free to leave at any time.

In addition, the district court also noted the following aspects of Fred's interview at the FBI office that support our conclusion that Fred was in custody because of the police-dominated atmosphere:

> First, agents whose weapons and badges were visible interviewed Fred in an FBI office. . . . Second, Fred's wife, who accompanied him to the FBI office, was denied the ability to be present at the interview, a fact that might have made him feel inhibited. . . . Finally, Social Services had notified Fred that his daughter had accused him of touching her inappropriately and understood that the subject of his conversations with the FBI officers could be those potentially criminal accusations.

ROA, Vol. I at 52 (Doc. 68 at 13) (citations and analogies to other cases omitted). The testimony at the suppression hearing supports these factual findings and the conclusion that Fred was in custody when he was interviewed. Specifically, Mahoney testified that his and Sayegh's badges and guns were displayed.

10

McClanahan testified that she and Fred passed through metal detectors at the entrance to the FBI office. Mahoney testified that he denied McClanahan access to the room where Fred was interviewed. McClanahan testified that Fred did not always understand "Anglo ways," and he wanted McClanahan with him during the interview. McClanahan also testified that social services was involved and told Fred go to the FBI office because N.F. claimed Fred had sexually molested her.

Taking all of these facts into consideration, we conclude that a reasonable person in Fred's position would have understood that he was in custody during the interview. Fred was in an enclosed room at the FBI office with two FBI agents, seated with his back to a door he reasonably thought was closed. The agents wore badges and guns. The interview lasted between one and a half and two hours. McClanahan was not permitted to be present in the room while her husband was interviewed. As Mahoney testified, Fred was told he could leave when he was done. Miranda warnings were not given prior to Fred's custodial interrogation, and the district court should have suppressed Fred's statements.

III

Having reached the conclusion that the district court erred in admitting Fred's oral and written statements to the FBI, we must now consider whether that error was harmless. We will only uphold Fred's conviction if we conclude the error was harmless beyond a reasonable doubt. United States v. Gomez, 191 F.3d 1214, 1223 (10th Cir. 1999). The government bears the burden of proof. United

11

States v. Summers, 414 F.3d 1287, 1303 (10th Cir. 2005).  We review the record de novo in conducting a harmless error analysis.  United States v. Perdue, 8 F.3d 1455, 1469 (10th Cir. 1993).

Because the government in this case has not argued that it was harmless error for the jury to receive evidence of the oral and written statements Fred made to the FBI, we cannot find beyond any reasonable doubt that if Fred's statements had been excluded, the jury would have reached the same verdict.

The judgment of the district court is REVERSED, and the case is REMANDED with directions to vacate Fred's conviction.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

12