FILED
United States Court of Appeals
Tenth Circuit

June 3, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

ANDY NAHKAI,

    Defendant - Appellee.

No. 24-4058

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 4:22-CR-00030-DN-PK-1)**
_____

Joseph Palmer, Assistant United States Attorney (and Trina A. Higgins, United States Attorney, with him on the briefs), Salt Lake City, Utah, for Plaintiff - Appellant.

Jessica Stengel, Assistant Federal Public Defender, (and Scott Keith Wilson, Federal Public Defender, with her on the brief), Salt Lake City, Utah, for Defendant - Appellee.
_____

Before **HARTZ**, **KELLY**, and **ROSSMAN**, Circuit Judges.
_____

**KELLY**, Circuit Judge.
_____

Defendant-Appellee, Andy Nahkai, was charged with two counts of abusive sexual contact with a child while within Indian country, 18 U.S.C. § 2244(c) & 1153, and one count of abusive sexual contact with a child age 12-16 while within Indian country, 18 U.S.C. § 2244(a)(3) & 1153. I Aplt. App. 13–14. The district court

granted Mr. Nahkai's motion to suppress statements that he made to law enforcement and the government now appeals. Id. at 126–27. On appeal, the government argues that when officers interviewed Mr. Nahkai in an unlocked police vehicle parked outside his home he was not "in custody" for purposes of Miranda v. Arizona, 384 U.S. 436 (1966), and therefore his statements were voluntary. Aplt. Br. 1, 11–12. We agree. Our jurisdiction arises under 18 U.S.C. § 3731, and we reverse.

## Background

On February 10, 2022, FBI Agent Jarrod Girod and Navajo Criminal Investigator Reeder Nez[1] went to Mr. Nahkai's home to investigate allegations of sexual abuse made by Mr. Nahkai's wife's niece ("the minor"). I Aplt. App. 89. Agent Girod drove in an unmarked Ford F-150 truck, and Investigator Nez drove in an unmarked SUV. Id. at 90. Investigator Nez wore a dark shirt with a law enforcement star and had a visible weapon on his right side. Id. at 92. Agent Girod wore civilian clothing — hiking pants and a button up shirt — and carried a concealed firearm. Id. Both officers' weapons remained holstered at all times relevant to this appeal. Id. at 94.

When the officers arrived at Mr. Nahkai's property, Mr. Nahkai's wife, Martha Nahkai, was standing at the front gate. Id. at 91. Mrs. Nahkai spoke with Investigator Nez before allowing the officers to enter the property. Id. at 92. Agent Girod drove toward the house and parked his truck facing the home about 30 to 40

---

[1] Mr. Nahkai is a member of the Navajo nation. I Aplt. App. 90.

feet from the front door. Id. Mr. Nahkai came outside, and Investigator Nez asked in Navajo, "can we talk with you a while?" Id. at 93. Mrs. Nahkai asked whether the officers wanted to speak with "just him" (referring to Mr. Nahkai), to which Investigator Nez replied, "we will get back with you." Id.

Investigator Nez introduced himself and identified Agent Girod as a "friend from Monticello." Id. Investigator Nez showed his badge and explained that they were there to "ask about some things[.]" Id. at 93–94. Agent Girod took over in English asking, "Why don't we, why don't we jump in the ride? Why don't you sit — do you want to sit in my passenger seat?" Id. at 94. Mr. Nahkai did not audibly reply, but he sat in the passenger seat of Agent Girod's truck. Id. Agent Girod sat in the driver's seat and Investigator Nez sat in the back seat directly behind Agent Girod. Id. Mrs. Nahkai was inside the home. Id. The interior of the truck had two indicia of law enforcement: a radio control with a microphone (which Agent Girod silenced during the questioning), and a rifle rack in the back. Id. at 94–95.

Before Mr. Nahkai got into the truck, neither officer asked him if he had weapons, handcuffed him, or touched him in any way. Id. at 94. Mr. Nahkai was not told that he was or was not under arrest. Id. The truck doors remained unlocked. Id. at 95. Although the officers did not tell Mr. Nahkai that the doors were unlocked, Agent Girod testified that one "could look down and see" that they were. Id. Neither officer administered Miranda warnings, and Mr. Nahkai was never told that he could terminate the interview or decline to answer questions. Id. The officers also never told him that he was required to stay and answer questions. Id.

3

Inside the truck, Agent Girod identified himself as a member of the FBI and questioned Mr. Nahkai for 41 minutes.  Id.  According to Agent Girod, the exchange was "conversational," but eventually became "confrontational," though nobody raised their voice.  Id. at 96.  A few minutes in, Agent Girod asked why the minor no longer lived in Mr. Nahkai's home.  Gov. Ex. 1, at 09:18–09:24.  Mr. Nahkai explained that Social Services removed the minor because she reported Mrs. Nahkai for physical abuse and Mr. Nahkai for sexual abuse.  Id. at 09:25–10:40.

A few minutes later, Agent Girod asked Mr. Nahkai about "massages" that the minor gave him.  Id. at 14:33–14:37.  Mr. Nahkai explained that he asked the minor to massage his leg after sustaining a hip injury from being bucked off a horse.  Id. at 14:38–14:56.  Without intervention from the officers, Mr. Nahkai continued that the massage "got out of hand" when the minor "slipped" her hand and he told her, "No. Don't do it."  Id. at 14:57–15:25.  According to Mr. Nahkai, this happened during a camping trip when the minor was seven years old.  Id. at 19:15–21:00.  Mr. Nahkai said that it only happened once.  Id. at 15:39–16:03.  Agent Girod responded:

> I don't believe you.  I think more happened than what you're saying. . . .
> You can't convince me that more than that didn't happen. . . . I'm not
> saying you're a bad guy, you're not a rapist, you didn't rape her. . . . But
> I think some of the massages kind of went a little farther than you're
> telling me about. . . . Tell me about her touching your penis and stroking
> it.

Id. at 17:00–17:45.  When Mr. Nahkai continued to deny the allegations, Agent Girod made similar assertions, stating that he knew the minor was telling the truth, that he knew Mr. Nahkai didn't rape the minor but that he thought things got out of hand,

4

and that he knew it happened more than once.  Id. at 17:57–20:00.  Eventually, Agent

Girod stated:

> I don't think you're a bad guy, but I do think things got a little out of hand, maybe went a little too far.  And I want to help you out here, but the thing is, like, this is your chance to come clean.  This is your chance to tell the truth about what happened. . . . You need to tell me about the other times that it happened. . . . Tell me about the times it happened here at the house.

Id. at 23:45–24:20.  Mr. Nahkai continued to deny the allegations, but eventually

stated that it happened again inside the home when the minor was about ten years

old.  Id. at 24:20–28:30.

Thus, Mr. Nahkai admitted that the minor touched his penis on two occasions.

I Aplt. App. 97, 99.  But he maintained throughout the questioning — despite Agent

Girod confronting him with his beliefs and the victim's accusations — that the minor

was responsible for the contact by either slipping her hand or initiating the

encounters.  Id. at 97–99.  At the end of the questioning Agent Girod stated, "Alright,

well uh, I think we're gonna talk with Martha here for just a second now if that's

alright.  You're good to go inside."  Gov. Ex. 1, at 45:00–45:10.  Mr. Nahkai exited

the truck and went back inside the home.  I Aplt. App. 99.

In pretrial proceedings, Mr. Nahkai moved to suppress the statements he made

on the grounds that they were made during a custodial interrogation without Miranda

warnings and were not voluntary under the Fifth Amendment.  Id. at 16–21.  The

district court held an evidentiary hearing at which the officers testified.  II Aplt. App.

132–213.  Pursuant to the district court's instruction, the parties drafted competing

5

proposed orders.  Id. at 189.  The government's proposed order concluded that the statements should not be suppressed because the interrogation was not custodial, and the statements were voluntarily obtained under the Fifth Amendment.  I Aplt. App. 29–40.  Mr. Nahkai's proposed order concluded the opposite.  Id. at 50–60.

The district court suppressed the statements.  Id. at 88–126.  The court analyzed "non-exhaustive factors" under "the totality of the circumstances" in concluding that the interrogation was custodial.  Id. at 101–02.  Three factors were dispositive: (1) the officers' failure to notify Mr. Nahkai that he was free to leave, (2) the accusatory nature of the questioning, and (3) the police domination of the encounter.  Id. at 102–22.  The district court recognized that some facts favored the government but found that they did not outweigh the facts favoring suppression.  Id. at 122–24.  On appeal, the government argues that the district court gave "inordinate weight to the fact that agents did not explicitly advise [Mr.] Nahkai that he could refuse to speak with them" in deciding the issue of custody.  Aplt. Br. at 12.

### Discussion

On review of an order granting a motion to suppress, the district court's factual findings are accepted "unless they are clearly erroneous, and we view the evidence in the light most favorable to the district court's determination."  United States v. Burleson, 657 F.3d 1040, 1044 (10th Cir. 2011) (quotations omitted).  On the other hand, we review the district court's legal conclusions de novo.  Id.  The government does not challenge any of the historical facts found by the district court.  Aplt. Reply Br. at 17.  The only question before us is whether those facts support the conclusion

6

that Mr. Nahkai was in custody while being questioned.  Id. at 17–18.  The determination of whether an interrogation was "custodial" is a legal conclusion which we review de novo.  United States v. Lamy, 521 F.3d 1257, 1261 (10th Cir. 2008).

It is well-established that law enforcement need not administer Miranda warnings every time a suspect is questioned.  United States v. Rogers, 391 F.3d 1165, 1169 (10th Cir. 2004).  Rather, Miranda's protections "only apply when an individual is subject to 'custodial interrogation.'"  Id. (quoting Miranda, 384 U.S. at 439).  A suspect is deemed to be in custody when their "freedom of action is curtailed to a degree associated with formal arrest."  Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quotations omitted).  The custody inquiry is objective and asks "whether 'a reasonable person in the suspect's position would have understood the situation . . . as the functional equivalent of formal arrest.'"  United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008) (quoting Berkemer, 468 U.S. at 442).

Under Tenth Circuit precedent, "several non-exhaustive factors" are helpful in assessing whether an interrogation is custodial.  United States v. Jones, 523 F.3d 1235, 1240 (10th Cir. 2008).  These include: (1) whether officers advise the suspect that he or she is not required to answer questions and/or that he or she may terminate the interview, (2) the nature of the questioning, and (3) whether police dominated the atmosphere of the encounter.  Id.  Still, we must not lose the forest for the trees but "look to the totality of the circumstances and consider the police-citizen encounter as a whole[.]"  Id.  Applying these principles, the questioning of Mr. Nahkai did not amount to a custodial interrogation.

7

## I.    Lack of Police Advisement

The officers never advised Mr. Nahkai that he could refuse to speak with them. I Aplt. App. 95.  The district court properly concluded that the lack of police advisement weighs in favor of finding that Mr. Nahkai was in custody.  Id. at 102–09. The government conceded as much at oral argument.  Oral Arg. at 04:33–04:44.

True, "the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention." United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993).  But we have been clear that the police advisement factor is not dispositive.  It is "only one factor to consider."  United States v. Guillen, 995 F.3d 1095, 1109 (10th Cir. 2021).  If this factor were dispositive in every case, it would displace other factors which we have consistently deemed relevant to the custody analysis.  Thus, although the lack of police advisement here favors a finding of custody, our focus remains on the totality of the circumstances because we cannot "pick[] some facts and ignor[e] others." Jones, 523 F.3d at 1240.

## II.    Nature of the Questioning

We next examine the nature of the questioning.  "[P]rolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave."  Griffin, 7 F.3d at 1518.  In assessing this factor, we consider facts like the length of the questioning, the substance of the questions and whether they were accusatory, and whether the tone was threatening.  See Guillen,

8

995 F.3d at 1110. These considerations inform whether the questioning rose "to the level of coercion." Id.

The district court noted that the questioning of Mr. Nahkai was short, and we agree. I Aplt. App. 112. Mr. Nahkai was questioned for approximately 41 minutes which is not so long as to render it coercive. E.g., Jones, 523 F.3d at 1238, 1241 (finding no custody where interrogation lasted for 45 minutes to an hour).

With respect to the substance of the questions, this court has recognized that a reasonable person would likely not believe they are effectively under arrest when officers focus their questioning on someone other than the suspect. Jones, 523 F.3d at 1241–42. Here, the officers focused only on Mr. Nahkai's involvement in the alleged sexual abuse. Nevertheless, the questioning was typical in terms of what one would expect during police questioning and was not so coercive as to make a reasonable person understand that they were effectively under arrest.

Indeed, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." California v. Beheler, 463 U.S. 1121, 1124 (1983) (quotations omitted). Agent Girod's insistence that Mr. Nahkai was not telling the truth, and his statement that he knew there was more to the story than Mr. Nahkai was letting on do not render his tactics coercive. Before arriving to Mr. Nahkai's house, Agent Girod reviewed the minor's forensic interview, and knew that the minor was removed from the Nahkai residence due to sexual abuse allegations. I Aplt. App. 89. It is no

9

surprise, then, that Agent Girod continued to ask Mr. Nahkai about these matters. In this regard, "[t]here is no indication that [Agent Girod's] questioning was any more coercive than what would be expected in any questioning by a police officer of an individual suspected of a crime." United States v. Simmonds, 641 F. App'x 99, 103 (2d Cir. 2016) (noting that the form of questioning did not "necessarily support a conclusion that the interrogation was custodial" where the defendant was accused of lying, confronted with incriminating evidence, and advised that it was in his best interest to be honest). When confronted with alleged wrongdoing, regardless of innocence, most suspects are likely to disagree and that alone does not render further questioning coercive. Although Agent Girod testified that the conversation became confrontational, it never became "unusually confrontational." Lamy, 521 F.3d at 1263. The extent to which the conversation may have become confrontational was not enough to have caused a reasonable person to understand the situation as the "'functional equivalent of formal arrest.'" Chee, 514 F.3d at 1112 (quoting Berkemer, 468 U.S. at 442).

In concluding otherwise, the district court held that the questioning was similar to that in United States v. Guillen. I Aplt. App. 110–13. That case is distinguishable. In Guillen, law enforcement went to the suspect's home after his ex-girlfriend found an improvised explosive device under her bed. 995 F.3d at 1101. Initially, two officers questioned the suspect for 50 minutes while other officers searched the suspect's bedroom. Id. at 1101–02. The suspect repeatedly denied involvement but confessed after the searching officers "laid out the evidence discovered during the

search, told [the suspect] it pointed to him, and asked if he created the improvised explosive device." Id. at 1102. We recognized that the situation escalated when the officers pressed the suspect despite repeated denials "and then confronted him with the mounting information and evidence collected during the search." Id. at 1110. It was only then that "a reasonable person in [the suspect's] position would not have felt free to leave or otherwise end the interview." Id.

Mr. Nahkai was never confronted with "mounting" physical evidence that "pointed to him." Id. at 1102, 1110. Agent Girod pressed Mr. Nahkai despite his denials, but Guillen required more to render the questioning coercive. The district court here stated that "[t]he relevant issue is whether the questioning is accusatory and coercive, not whether the officers used physical evidence during the questioning." I Aplt. App. 114. But in Guillen, the precise reason that the officers' questioning became coercive was that they eventually confronted the suspect with substantial incriminating evidence. 995 F.3d at 1110. At that point, "an arrest was likely, and — after being confronted with that evidence — a reasonable person in [the suspect's] shoes . . . would have reasonably understood his situation as the functional equivalent of formal arrest." Id. at 1111. Thus, the nature of the questioning here is different from that in Guillen.

Finally, Agent Girod's questioning "even when directed at soliciting a confession . . . remained calm and conversational." United States v. Wagner, 951 F.3d 1232, 1251 (10th Cir. 2020) (quotations omitted). At no point did anyone raise their voice. I Aplt. App. 96; see Guillen, 995 F.3d at 1110 (noting that questioning

11

was not coercive in part because officers did not speak in a threatening tone). Indeed, our review of the audio recording satisfies us that Mr. Nahkai was never threatened or unduly pressured into answering Agent Girod's questions. In fact, Mr. Nahkai's first mention of sexual contact with the minor seemingly occurred on his own volition. After Agent Girod asked about the massages, Mr. Nahkai explained that the minor would massage his injured hip and, without intervention, continued that the minor's hand "slipped." Gov. Ex. 1, at 14:33–15:25. Thus, we do not believe that the nature of the questioning rose to the level of coercion that would make a reasonable person in Mr. Nahkai's position understand the situation to be the "'functional equivalent of formal arrest.'" Chee, 514 F.3d at 1112 (quoting Berkemer, 468 U.S. at 442).

### III.   Police-Dominated Atmosphere

The Miranda Court was primarily concerned with combatting oppressive forces created by an "incommunicado police-dominated atmosphere." 384 U.S. at 456. Accordingly, "[w]here police are in full control of the questioning environment, custody is more easily found." Griffin, 7 F.3d at 1518–19. Several factors bear on whether police dominated the encounter, including:

> separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

Id. at 1519. Again, although the factors are helpful, the ultimate inquiry is one of the totality of the circumstances. Jones, 523 F.3d at 1240.

12

We first note that a few of these factors are plainly absent here. First, at no point did the officers touch Mr. Nahkai. It is significant that Mr. Nahkai "retained freedom of movement throughout the interview[.]" United States v. Johnson, 39 F.4th 1047, 1051 (8th Cir. 2022). Mr. Nahkai was never searched, handcuffed, or physically restrained, the doors remained unlocked, and he "entered and exited the front seat of the vehicle on his own." Id.; I Aplt. App. 94–95, 99. Mr. Nahkai's "voluntary decision to accompany police argues against police domination." Lamy, 521 F.3d at 1264; Jones, 523 F.3d at 1242. It is also notable that Mr. Nahkai sat in the front seat of Agent Girod's truck – – not in the back seat behind physical barriers — which suggests a lack of arrest. Lamy, 521 F.3d at 1264. And we have already explained that the tone of the interview remained calm and non-threatening.

The presence of two officers in mostly plain clothing is not considered coercive. Wagner, 951 F.3d at 1251 (noting that "only two" officers interviewed the suspect); Jones, 523 F.3d at 1242 (noting the officers' plain clothes in finding a lack of police domination). True, Investigator Nez's firearm was visible, but it remained holstered and there is no indication that he displayed or brandished it in a threatening or coercive manner. See Jones, 523 F.3d at 1238 ("At no point did the agents brandish or unholster their concealed weapons[.]"). That Investigator Nez's firearm was visible does not automatically render the encounter custodial, or else nearly every such encounter will be custodial given that officers investigating serious crimes will almost always carry firearms. See United States v. Drayton, 536 U.S. 194, 205

13

(2002) (noting in the context of Fourth Amendment consent searches that "[t]he presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon").

We recognize that Mr. Nahkai and Mrs. Nahkai were in separate locations while Mr. Nahkai was questioned. But context matters. Our prior decisions have placed weight on the isolation factor when officers specifically deny a request for another person to be present during questioning. E.g., United States v. Fred, 322 F. App'x 602, 603–04 (10th Cir. 2009). In Fred, the suspect asked for his wife to be present during his questioning, but the officers denied her access to the interview room. Id. at 607. Here, nobody specifically requested that Mrs. Nahkai be present for the questioning. True, Mrs. Nahkai asked whether the officers wanted to speak with "just him," but there is no indication that the officers would have rebuffed any request for Mrs. Nahkai to be present during questioning. I Aplt. App. 93; cf. Yarborough v. Alvarado, 541 U.S. 652, 665 (2004) (noting that officers rebuffed the suspect's parent's request to be present during the interview which favored a finding of custody). Further, though technically separated from Mr. Nahkai, Mrs. Nahkai "remained nearby" in the house which was only 30 to 40 feet away. Wagner, 951 F.3d at 1251; I Aplt. App. 92, 94.

With respect to the location of the interview, Mr. Nahkai was not questioned at a station house where there are "inherently coercive pressures[.]" Howes v. Fields, 565 U.S. 499, 509 (2012). At the same time, Mr. Nahkai was

14

not questioned inside his home where "courts are <u>much less likely</u> to find the circumstances custodial[.]" <u>United States v. Ritchie</u>, 35 F.3d 1477, 1485 (10th Cir. 1994) (quotations omitted). Still, the questioning occurred on Mr. Nahkai's property, in close proximity to his home in an unmarked and unlocked police vehicle that had no physical restraints. <u>Jones</u>, 523 F.3d at 1242 ("Police need not administer <u>Miranda</u> warnings simply because the questioning is conducted in a certain place, i.e., a patrol car." (quotations omitted)). And Agent Girod's truck "lacked virtually any official indicia that might normally intimidate a person placed into a fully equipped police vehicle" apart from a silenced radio and a rifle rack in the back. <u>Id.</u> at 1243; I Aplt. App. 94. There is no evidence as to whether the rifle rack was equipped with firearms. <u>See</u> I Aplt. App. 94. And although the officers could have asked to interview Mr. Nahkai inside his home, it was also understandable for them "to be cognizant of [Mr. Nahkai's] privacy and ask to speak inside [their] car," given that the questioning related to a sensitive topic: sexual assault allegations made by Mrs. Nahkai's niece. <u>Jones</u>, 523 F.3d at 1242.

In concluding that the encounter was police-dominated, the district court relied on <u>United States v. Fred</u>. I Aplt. App. 116–22. In that case, several factors indicated that the atmosphere was police-dominated. Namely: (1) officers' badges and weapons were visible, (2) the suspect's wife was denied the ability to be present, (3) Social Services had already notified the suspect of the accusations against him such that he understood that the conversation

15

could be about those accusations.  <u>Fred</u>, 322 F. App'x at 607.  But in addition to those facts, the suspect was questioned for over an hour and a half in an FBI room where he had to pass through a metal detector.  <u>Id.</u>  The suspect's view also did not allow him to see whether the door to the questioning room was closed.  <u>Id.</u>  And the suspect was specifically told that he could leave "when he was done."  <u>Id.</u>  Many of these additional factors suggesting a police-dominated atmosphere are not present here.  Rather, this case is similar to the non-custodial interrogation in <u>United States v. Johnson</u>, where the suspect was questioned in an unlocked police vehicle outside his home, was not touched, entered and exited the vehicle by himself, acquiesced to the interviews, was not subjected to strong-arm tactics, and was not arrested when the interview ended.  39 F.4th at 1051–52.

## IV.    The Dissent

The dissent explains that we apply significant deference to not only the district court's factual findings but also to the prevailing party, thereby constraining our appellate review.  All agree that the district court's factual findings are accepted, and the evidence is viewed "in the light most favorable to the district court's determination."  <u>Burleson</u>, 657 F.3d at 1044 (quotations omitted).  The ultimate question of whether an interrogation was custodial is a legal conclusion which we review de novo.  <u>Id.</u>  Therefore, we determine whether the historical facts as found by the district court, unchallenged by either party, support the legal conclusion that the interrogation was custodial.  On this legal question, we are not a rubber stamp for the

district court's conclusion.  See United States v. Erving L., 147 F.3d 1240, 1246 (10th Cir. 1998) (noting that the overall custody analysis is a mixed question of fact and law reviewed de novo, "with proper deference to the district court's findings of historical fact").

The premise of the dissent seems to be that law enforcement questioning is per se coercive.  The dissent views this case as analogous to Guillen, but merely informing a suspect of the victim's allegations does not result in a coercive environment suggesting that a suspect must answer the questions and is not free to leave.  After all, from start to finish Mr. Nahkai maintained his story that the minor initiated the encounters and that she was to blame because her hand "slipped" onto his penis.  Nor is there any evidence that the presence or absence of Mrs. Nahkai had any effect on Mr. Nahkai.  The officers told Mrs. Nahkai they would "get back with [her]" after speaking with Mr. Nahkai.  I Aplt. App. 93.  When the interview ended, the officers told Mr. Nahkai he was "good to go inside" and that they were "gonna talk with Martha."  Gov. Ex. 1, at 45:00–45:10.  Moreover, we have held that Miranda warnings are not required merely because the questioning occurs in a law enforcement vehicle.  Jones, 523 F.3d at 1242.

The dissent also does not address several facts which weigh against a finding of custody including the fact that (1) the vehicle remained unlocked, (2) one could look down and see that the vehicle was unlocked, (3) Mr. Nahkai was never searched, handcuffed, or touched, (4) Mr. Nahkai was the first to mention sexual abuse and (without any officer intervention) that the massages "got out of hand" when the

17

minor's hand "slipped," and (5) Mr. Nahkai sat in the passenger seat of the vehicle without any physical restraints.

In sum, based on the totality of the circumstances and the underlying historical facts, Mr. Nahkai was not in custody and Miranda warnings were not required. We conclude that Mr. Nahkai's statements were not made during a custodial interrogation. Although Mr. Nahkai was not advised that he was free to leave, a reasonable person in his position would not have understood the situation as the "'functional equivalent of formal arrest.'" Chee, 514 F.3d at 1112 (quoting Berkemer, 468 U.S. at 442). The district court's order granting Mr. Nahkai's motion to suppress is therefore

REVERSED, and the case is REMANDED for further proceedings.

*United States* v. *Nahkai*, No. 24-4058

**ROSSMAN, J., dissenting**

The Supreme Court has long recognized "in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work . . . to compel him to speak where he would not otherwise do so freely." *Miranda* v. *Arizona*, 384 U.S. 436, 467 (1966). Consistent with the Fifth Amendment right against self-incrimination, *Miranda* warnings "guard against this danger." *United States* v. *Guillen*, 995 F.3d 1095, 1108 (10th Cir. 2021). "Without these warnings, custodial confessions are . . . generally inadmissible." *Id.* at 1109. Because it targets pressures that are most prominent in the setting of custody, "*Miranda* applies only to 'custodial interrogation[s].'" *United States* v. *Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (quoting *Miranda*, 384 U.S. at 444).

Pursuant to *Miranda*, Mr. Nahkai moved to suppress statements he made during an interrogation by law enforcement. The district court granted the motion. I would affirm the district court's well-reasoned order. Because the majority concludes otherwise, I respectfully dissent.

**I**

Nobody disputes Mr. Nahkai was interrogated without receiving *Miranda* warnings. The "question before us," as the majority correctly explains, "is whether [the] facts support the conclusion that Mr. Nahkai was

1

in custody while being questioned." Op. at 6–7. To determine whether someone was in "custody" when interrogated, we consider, based on the totality of the circumstances, whether "a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest." *Jones*, 523 F.3d at 1239 (quoting *United States* v. *Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008)); *see also California* v. *Beheler*, 463 U.S. 1121, 1125 (1983) ("[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (quoting *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977)). Three factors guide our "fact-intensive inquiry":

> (1) whether "the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will";
>
> (2) "the nature of the questioning"; and
>
> (3) "whether the environment was 'police dominated.'"

*Chee*, 514 F.3d at 1112–13 (quoting *United States* v. *Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)).

Before turning to the analysis, I want to emphasize our standard of review—which the majority acknowledges and the government does not contest. When a district court grants a motion to suppress, an appellate court "accepts the district court's factual findings unless clearly erroneous and views the evidence in the light most favorable to the prevailing party."

2

*Jones*, 523 F.3d at 1239 (quoting *United States* v. *Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000)); *see also Griffin*, 7 F.3d at 1514 (explaining, even when district court does not make factual findings in ruling on a motion to suppress, "we look to the evidence supporting [the prevailing party's] case and give to this evidence the benefit of every reasonable inference"). The government has not argued any of the district court's factual findings are clearly erroneous, so we must accept them, even if we would have weighed the evidence differently had we been the trier of fact. *See Jones*, 523 F.3d at 1239. And Mr. Nahkai won his suppression motion, so we view the evidence in the light most favorable to him. *See id.* These principles establish significant deference—to the district court's factual findings and to the prevailing party—which constrains our appellate review of the district court's suppression order in meaningful ways. We then consider *de novo* "[t]he ultimate question of whether *Miranda* applies." *Id.*

## II

I would affirm the district court's conclusion that Mr. Nahkai was in custody when Agent Girod and Investigator Nez interrogated him. As to the first factor, all agree it supports custody. We have repeatedly stated "the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention." *Griffin*, 7 F.3d at 1518; *Guillen*, 995 F.3d at 1109 (same). The record shows

3

the officers never told Mr. Nahkai he could decline questioning or end the interview. *See* Op. at 8. Unlike the majority, however, I also conclude the second and third factors show Mr. Nahkai underwent a custodial interrogation. Any "totality of the circumstances" inquiry confirms as much. *See Jones*, 523 F.3d at 1240 (explaining the factors are "non-exhaustive" and are not "hard line rules").

## A

### 1

I begin with the nature of the questioning. "[P]rolonged accusatory questioning is likely to create a coercive environment." *Griffin*, 7 F.3d at 1518. The majority does "not believe that the nature of the questioning rose to the level of coercion that would make a reasonable person in Mr. Nahkai's position understand the situation to be the 'functional equivalent of formal arrest.'" Op. at 12 (quoting *Chee*, 514 F.3d at 1112). I respectfully disagree.

*First*, as the district court correctly observed, "the questioning [of Mr. Nahkai] was . . . similar to the questioning in *United States* v. *Guillen*[,] where the Tenth Circuit held the questioning weighed in favor [of] finding custody." RI.110; *see Guillen*, 995 F.3d at 1110.

In *Guillen*, police officers "questioned [a suspect] . . . for about 50 minutes, during which time he repeatedly denied any involvement with making [a] pressure cooker bomb." *Id.* at 1102. The officers "then laid out

4

the evidence discovered" during their investigation, "told [the suspect] it pointed to him, and asked if he created the . . . explosive device." *Id.* We held the suspect was in custody at this point. *See id.* at 1111. In so holding, we emphasized the officers "pressed [the suspect] despite his repeated denials of involvement and then confronted him with the mounting information and evidence collected during the search." *Id.* at 1110. "Considering the evidence the agents had discovered, an arrest was likely," we reasoned, "and—after being confronted with that evidence—a reasonable person in [the suspect's] shoes would have recognized as much." *Id.* at 1111; *see also id.* ("It is difficult to ignore the effect that [the officers'] accusatory questioning had on the nature of the interrogation."). Given the totality of the circumstances, the interrogation in *Guillen* was custodial even though no officers "spoke in a threatening tone" to the suspect. *Id.* at 1110.

The similarities between *Guillen* and this case are readily apparent. Here, like in *Guillen*, the officers questioned Mr. Nahkai for just over 40 minutes. *See id.* at 1102. And Mr. Nahkai, too, "repeatedly denied any" wrongdoing. *Id.* During the interrogation, Mr. Nahkai told the officers:

- The alleged victim "all of [a] sudden just slipped. And I said no. Don't do it.";

- "[S]he just touch[ed] it . . . . I said . . . don't. That's enough."; and

5

- "I don't tell her to do this for me."

RI.97–98. Despite these repeated denials, the officers here, like in *Guillen*, continued to press the issue. For example, Agent Girod told Mr. Nahkai:

- "I don't believe you, all right?";

- "[Y]ou can't convince me that more than that didn't happen . . . . I know what happened between you"; and

- "I don't think you're telling me the whole truth there. There's still things you're leaving out."

RI.97–99; *see* RI.114. The officers also confronted Mr. Nahkai with "mounting information and evidence" against him. *Guillen*, 995 F.3d at 1110. Agent Girod told Mr. Nahkai:

- "I know she stroked your penis on the skin until you ejaculated . . . That's what I know."; and

- "You pulled it out and you had her stroke it on the skin. I know she's telling me the truth when she says that."[1]

RI.97, 99; *see* RI.114.

---

[1] *Guillen* even features parallel language from law enforcement. There, an officer similarly told the suspect "*we know* that you purchased a pressure cooker and it's gone. *We know* that a soldering iron was used in this device, and your dad's soldering iron is missing." *United States* v. *Guillen*, 995 F.3d 1095, 1110 (10th Cir. 2021) (emphasis added). If anything, the questioning here was more accusatory because the officers told Mr. Nahkai *they believed* he was guilty. In *Guillen*, the officers only told the suspect "the evidence . . . pointed to him." *Id.* at 1102.

6

*Guillen* is no outlier. As the district court observed, "the successive revelation[]" of incriminating facts has always been a mark of custodial interrogation. RI.114; *see United States* v. *Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007) ("[I]t is difficult to ignore the effect that the display of the recently seized drugs had on the tone of the interrogation. After being confronted with the drugs in an accusatory manner, we have no doubt that [the suspect] would have reasonably felt compelled to cooperate with the police." (citation omitted)); *United States* v. *Rith*, 164 F.3d 1323, 1332 (10th Cir. 1999) (holding the suspect was in custody once "he was confronted with the illegal shotgun"); *Griffin*, 7 F.3d at 1519 (in finding the suspect was in custody, explaining the interrogation "continued even after it was obvious defendant was incriminated"); *cf. Jones*, 523 F.3d at 1242 (explaining that when questions "focus[] primarily on someone other than" the suspect, they "point[] away from a finding of custody").

*Second,* I find persuasive Mr. Nahkai's argument that "Agent Girod intensified the effects of isolation in the very ways *Miranda* identified as psychological coercion." Ans. Br. at 36. In *Miranda,* the Supreme Court described "tactics" that "highlight . . . isolation and unfamiliar surroundings" and "put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty." 384 U.S. at 450. To achieve these manipulative ends, *Miranda*

7

observed, officers first "display an air of confidence in the suspect's guilt," and thereafter, "minimize the moral seriousness of the offense," "cast blame on the victim or on society," and suggest the suspect is "[l]ike other men." *Id.* When officers use these coercive tactics, suspects experience a "psychological state" more akin to formal arrest.[2] *Id.*

The record confirms Agent Girod used the tactics described in *Miranda*. Agent Girod first "display[ed] an air of confidence in [Mr. Nahkai's] guilt"—as described above. *Id.* at 450. Then Agent Girod "minimize[d] the moral seriousness of the offense," *Miranda*, 384 U.S. at 450, by insisting:

- "I'm not saying you're a bad guy. Right? You're not a rapist, right? You didn't rape her.";

- "You never raped her, right?";

- "Like I said. I don't think you're a bad guy . . . And I want to help you out here."

---

[2] The government responds "th[e]se portions of *Miranda*'s rationale explain why warnings are required when suspects are subject to *custodial* interrogation, not whether the suspect is in custody in the first place." Reply Br. at 16. I am unpersuaded. These excerpts from *Miranda* describe precisely the most coercive aspects of custodial interrogation. When we find those traits present in a given setting, therefore, that setting is both more likely to be custodial *and* more likely to involve coercion.

8

RI.97–98. He also "cast blame on . . . society," *Miranda*, 384 U.S. at 450, by suggesting:

- "There's people out there that think you're a rapist and you did terrible things to her. But I, I don't think that.";

- "I want to be able to go and be like this guy is a good person. He is sorry for what he did. . . . It didn't go beyond that."

RI.98–99. Finally, Agent Girod said Mr. Nahkai was "like other men," *Miranda*, 384 U.S. at 450:

- "I mean you got a girl touching you on the legs and stuff like things happen. We're all guys here. That's normal." RI.99.

The nature of the questioning, therefore, shows a custodial interrogation and counsels in favor of affirmance.[3]

**2**

I am unpersuaded by the majority's contrary conclusion and reasoning.

To begin, the majority misses the import of *Guillen*. The majority claims *Guillen* "is distinguishable" because "Mr. Nahkai was never

---

[3] The majority states "the premise of the dissent seems to be that law enforcement questioning is per se coercive." Op. at 17. That is not the case. I recognize only that, according to binding precedent, certain questioning tactics make an environment more coercive. And the officers used those tactics here.

confronted with 'mounting' physical evidence that 'pointed to him.'" Op. at 10–11 (quoting *Guillen*, 995 F.3d at 1102, 1110). That Agent Girod confronted Mr. Nahkai with the alleged victim's *testimony*—and not with *physical* evidence, as in *Guillen*—is a factual distinction that makes no legal difference. *Guillen* emphasized officers "confronted [the suspect] with the mounting information and evidence collected"—a statement that applies equally to testimonial evidence. 995 F.3d at 1110. Neither *Guillen* nor common sense supports the majority's view that a coercive environment depends on the precise type of incriminating evidence presented to a suspect.

Further, the majority makes claims about the record that stand in tension with the district court's factual findings. According to the majority, the interrogation "never became 'unusually confrontational.'" Op. at 10 (quoting *United States* v. *Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008)). Yet the district court made no such finding, instead quoting Agent Girod's admission the interrogation "became confrontational," with no qualifications. RI.96. The court later described the interrogation as "accusatory." RI.110. We must accept the district court's factual findings—which nobody says are clearly erroneous—and view the evidence for Mr. Nahkai, who prevailed in the district court. *Jones*, 523 F.3d at 1239.

10

The majority also insists the interrogation of Mr. Nahkai was "typical in terms of what one would expect during police questioning." Op. at 9. Again, the district court did not make this finding. Nor does the majority explain what "typical" police questioning involves. In my view, a reasonable suspect who went through Agent Girod's questioning would know an arrest was imminent. Unsurprisingly, Mr. Nahkai was indicted only a few weeks after the interrogation.[4]

On the basis of the district court's unchallenged factual findings and viewing the evidence in the light most favorable to Mr. Nahkai, I conclude a reasonable person in Mr. Nahkai's position would have understood the interrogation as the functional equivalent of an arrest.[5]

---

[4] The majority relies on case law to support its reasoning. *See, e.g.*, Op. at 9 ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it." (quoting *California* v. *Beheler*, 463 U.S. 1121, 1124 (1983)); Op. at 11 (suggesting the questioning "remained calm and conversational" (quoting *United States* v. *Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020)); *see also* Op. at 16 (citing *United States* v. *Johnson*, 39 F.4th 1047, 1051–52 (8th Cir. 2022)). But these cases are instructive only if one accepts the *majority's* view of the facts rather than the district court's unchallenged findings.

[5] The majority says the 41-minute interrogation here was "short." Op. at 9. The temporal component of the custody inquiry seems relatively neutral in this case. A suspect questioned for 41 minutes is less likely to doubt their freedom than one questioned for four hours, but more likely to doubt it than one questioned for four minutes. And in *Guillen*, we concluded the nature of the questioning supported a finding of custody, even though the interrogation lasted a similar amount of time. *See Guillen*, 995 F.3d at

11

**B**

**1**

I now address whether Agent Girod and Investigator Nez "dominate[d] the encounter" with Mr. Nahkai. *Jones*, 523 F.3d at 1240. To assess this factor, we consider "the following helpful guideposts":

> separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id.* (quoting *Griffin*, 7 F.3d at 1519). The district court held "police domination of the encounter weighs in favor of finding Nahkai was in custody." RI.116. I discern no error. At least three of the sub-factors—separation from family, isolation in a nonpublic questioning space, and threatening language—show the officers commanded their encounter with Mr. Nahkai.

*First*, the district court concluded "Nahkai's wife, Martha, was denied the opportunity to accompany Nahkai to the interview, and the agents separated Martha from her husband." RI.121; *see Griffin*, 7 F.3d at 1519. According to the district court, the officers showed up unannounced at the

---

1102, 1110–11 (stating 50 minutes is not "an especially long period of time," but not calling it a short period of time).

Nahkai home and informed Martha they wished to speak with only Mr. Nahkai. The officers then instructed Mr. Nahkai alone to enter Agent Girod's truck. We have repeatedly held this kind of separation demonstrates an interrogation was custodial. *See Griffin*, 7 F.3d at 1519 (holding a suspect was in custody in part because she "was separated from her friend"); *Revels*, 510 F.3d at 1276 (same when "[o]fficers purposefully separated [the suspect] from her boyfriend and children and removed her to a back room"); *United States* v. *DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir. 1978) (same when the "[d]efendant was kept apart from his companion").

*Second*, the district court found "[t]he interrogation took place in an unmarked police vehicle in an area that was isolated and private." RI.120; *see Griffin*, 7 F.3d at 1519. When Mr. Nahkai entered Agent Girod's truck, he could see it was armed with a rifle rack and a police radio, and Agent Girod identified himself as an FBI agent. The district court found Mr. Nahkai lived in a remote area and "the home and yard were readily available locations for a discussion." RI.119; *see* RI.91, 94. Under the circumstances, the district court rightly concluded, a reasonable suspect would have felt the "agents were in 'full control' of the . . . place of the encounter." RI.120 (quoting *Griffin*, 7 F.3d at 1518–19); *see Griffin*, 7 F.3d at 1519 (finding a police-dominated atmosphere when the suspect was

13

"asked to accompany an officer to a small private office within a police-controlled area of the airport").

*Third*, the district court found the officers "used language that suggested Nahkai's confession was required." RI.121; *see Griffin*, 7 F.3d at 1519. Agent Girod told Mr. Nahkai "you need to tell me about the other times." RI.98. Agent Girod also said "this is your chance to tell the truth," and "[t]here's people out there that think you're a rapist and you did terrible things to her. . . . But I can't help you out if you're not telling me the whole truth, right?" RI.98, 121–22. This encounter would suggest to a reasonable suspect that he must answer the questions posed by law enforcement. *See DiGiacomo*, 579 F.2d at 1213–14 (holding a suspect was in custody when "[h]e was told he could choose between immediate arrest and 'voluntary' appearance at the Secret Service office"). Notably, after the interview ended, Agent Girod told Mr. Nahkai he was "good to go." RI.99. The district court correctly reasoned "this language demonstrates that the agents were in full control over the duration of the interrogation, and it was over when the agents decided it was over." RI.122.

I acknowledge the officers did not use physical force, and only two officers interrogated Mr. Nahkai. *See Griffin*, 7 F.3d at 1519 (listing these as relevant sub-factors). But we have never suggested police domination

14

requires the actual use of physical force or the involvement of a large group of officers.[6]

## 2

Guided by our standard of review, I cannot accept the majority's conclusion the officers did not dominate the interrogation's atmosphere.

The majority says Mr. Nahkai made a "voluntary decision to accompany police," which "argues against police domination." Op. at 13 (quoting *Lamy*, 521 F.3d at 1264). To the extent the majority suggests Mr. Nahkai offered himself for questioning, our standard of review forbids that finding on appeal. *See Jones*, 523 F.3d at 1239 (explaining we "view[] the evidence in the light most favorable to" Mr. Nahkai (quoting *Hudson*, 210 F.3d at 1190)). The district court found Investigator Nez showed Mr. Nahkai his badge and said he wanted "to ask about some things." RI.93–94. Agent Girod then told Mr. Nahkai, "Why don't we, why don't we jump in the ride?," Investigator Nez said "[o]kay," and Mr. Nahkai offered no response. RI.94. Only then did Mr. Nahkai enter the vehicle. Reviewing the evidence in the light most favorable to Mr. Nahkai, I find he did not act with any

---

[6] The final subfactor in *Griffin*—"display of a weapon"—favors neither party. *United States* v. *Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993). Investigator Nez possessed a visible firearm, but he did not unholster it. Similarly, while Agent Girod's truck contained a rifle rack, no one ever reached for any weapons.

meaningful willingness. *See Griffin*, 7 F.3d at 1519 & n.8 (declining to find a "wholly voluntary . . . environment," even when the suspect acted somewhat "voluntarily").

The majority also says "context" explains why "Mr. Nahkai and Mrs. Nahkai were in separate locations while Mr. Nahkai was questioned." Op. at 14. "[N]obody specifically requested that Mrs. Nahkai be present for the questioning," the majority explains. Op. at 14. The majority cites no authority that such a specific request is required.[7] In any event, Mrs. Nahkai did indicate she wanted to accompany her husband during his questioning, as the district court found. *See* RI.93, 121 (Mrs. Nakhai asking whether the officers wanted to speak with "just him?"—meaning Mr. Nahkai).[8]

---

[7] The majority likewise states there is no "evidence that the presence or absence of Mrs. Nahkai had any effect on Mr. Nahkai," Op. at 17, again without citing any authority that such evidence is required.

[8] The majority also says "Mrs. Nahkai 'remained nearby' in the house." Op. at 14 (quoting *Wagner*, 951 F.3d at 1251). I do not see why that matters. In other cases where suspects have remained "nearby" potential supporters, we have held that separating them favored a finding of custody. *See United States* v. *DiGiacomo*, 579 F.2d 1211, 1212 (10th Cir. 1978) (explaining the "defendant and the young lady were separated from each other by some 25 to 30 feet"—less than the 30 to 40 feet here, *see* Op. at 14); *United States* v. *Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007) (explaining the suspect was in the same house as her family, but was "separated . . . to a back room").

16

The majority next declines to view the truck as an isolated, nonpublic space. It reasons "Agent Girod's truck 'lacked virtually any official indicia that might normally intimidate a person'"; "the questioning occurred on Mr. Nahkai's property"; and it was "understandable" for the officers "'to be cognizant of [Mr. Nahkai's] privacy and ask to speak inside [their] car,' given that the questioning related to a sensitive topic: sexual assault." Op. at 15 (quoting *Jones*, 523 F.3d at 1242). Again, I disagree.

For one, Agent Girod's truck had a rifle rack and a radio—clear indicia of law enforcement. The majority says "there is no evidence as to whether the rifle rack" in Agent Girod's truck "was equipped with firearms." Op. at 15. But an inference that the rifle rack was empty is impermissible because it favors the government. *See Griffin*, 7 F.3d at 1517 (drawing "reasonable inferences" in favor of district court's ruling). Regardless, the setting here was unlike the car in *Jones*, where "besides the police radio, which . . . was inconspicuously located . . . nothing inside the car revealed it to be a police unit." 523 F.3d at 1243. Agent Girod also identified himself as an FBI agent when Mr. Nahkai entered the police vehicle.

Next, I do not see the truck's location on Mr. Nahkai's property as inconsistent with police domination. It is true "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar . . . surroundings." *United States* v. *Ritchie*, 35 F.3d 1477, 1485

17

(10th Cir. 1994) (citation omitted). During the interrogation, however, Mr. Nahkai was inside an unfamiliar vehicle that belonged to law enforcement. The officers could have transported Mr. Nahkai off his property at their discretion.

Nor do I assume, as the majority does, that the officers were "understandabl[y]" protecting Mr. Nahkai's privacy by interrogating him inside the truck. Op. at 15. The record does not suggest the officers isolated Mr. Nahkai to protect his privacy, and the district court made no such finding. Even when officers have conducted an interrogation about sensitive accusations in a private place, we have recognized that isolating the suspect demonstrates police domination. *Compare United States* v. *Fred*, 322 F. App'x 602, 607 (10th Cir. 2009)[9] (finding a suspect in custody when questioned about sexual abuse, in part because he was questioned "in an enclosed room" and his wife "was not permitted to be present"), *and Revels*, 510 F.3d at 1276 (finding a suspect in custody when questioned about cocaine distribution, in part because officers "removed her to a back room"), *with Lamy*, 521 F.3d at 1263 (finding a suspect not in custody when questioned about sexual abuse, in part because the suspect was questioned

---

[9] I cite this unpublished case for its persuasive value only. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); Fed. R. App. P. 32.1.

18

"in a common area of his home" and "his mother came and went from the room"), *and Guillen*, 995 F.3d at 1100, 1109 (finding a suspect not in a police-dominated environment when questioned about an explosive device, in part because the suspect "moved freely about his home" and his "father and brother were also present").[10]

The district court correctly held each of our three guiding factors—advisement of the right to decline questioning, nature of the questioning, and police-dominated atmosphere—favors a finding of custody.

### C

Our inquiry depends on the "totality of the circumstances," and the three factors are "non-exhaustive." *Jones*, 523 F.3d at 1240. Acknowledging this principle, the district court carefully reasoned "[u]nder the totality of the circumstances, Nahkai was in custody during the interrogation." RI.123. I agree. This is a case where officers arrived unannounced on Mr. Nahkai's property, separated him from his wife, questioned him inside a police vehicle, repeatedly accused him of committing child abuse despite his repeated denials, referenced the alleged victim's graphic testimony, and

---

[10] Assuming Mr. Nahkai's privacy should factor into our analysis, the officers still had no reason—other than dominating the encounter—to proactively isolate Mr. Nahkai in Agent Girod's truck. They could have simply asked Mr. Nahkai if he wanted to speak alone. And the district court stressed they could have spoken with him in "Nahkai's house or the front yard," rather than in the single nearby space they controlled. RI.120.

19

then minimized the abuse itself because "we're all guys here." RI.97–99, 114. The officers never told Mr. Nahkai he could decline to answer their questions or end the interrogation. Like the district court, I have no doubt this experience would have constituted "the functional equivalent of formal arrest" to a reasonable suspect. *Jones*, 523 F.3d at 1239 (quoting *Chee*, 514 F.3d at 1112); RI.124.